[Crim. No. 22525. Feb. 6, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY MARK BEEMAN, Defendant and Appellant.

548

**COUNSEL**

James R. Graff, under appointment by the Court of Appeal, Quin Denvir, State Public Defender, and Julia Cline Newcomb, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Carol Wendelin Pollack, James T. McNally, Robert G. Mendez and Christine C. Franklin, Deputy Attorneys General, for Plaintiff and Respondent.

John K. Van de Kamp, District Attorney (Los Angeles), Donald J. Kaplan and George M. Palmer, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**REYNOSO, J.**—Timothy Mark Beeman appeals from a judgment of conviction of robbery, burglary, false imprisonment, destruction of telephone equipment and assault with intent to commit a felony (Pen. Code, §§ 211, 459, 236, 591, 221). Appellant was not present during commission of the offenses. His conviction rested on the theory that he aided and abetted his acquaintances James Gray and Michael Burk.

The primary issue before us is whether the standard California Jury Instructions (CALJIC Nos. 3.00 and 3.01) adequately inform the jury of the

criminal intent required to convict a defendant as an aider and abettor of the crime.

We hold that instruction No. 3.01 is erroneous. Sound law, embodied in a long line of California decisions, requires proof that an aider and abettor rendered aid with an intent or purpose of either committing, or of encouraging or facilitating commission of, the target offense. It was, therefore, error for the trial court to refuse the modified instruction requested by appellant. Our examination of the record convinces us that the error in this case was prejudicial and we therefore reverse appellant's convictions.

James Gray and Michael Burk drove from Oakland to Redding for the purpose of robbing appellant's sister-in-law, Mrs. Marjorie Beeman, of valuable jewelry, including a 3.5 carat diamond ring. They telephoned the residence to determine that she was home. Soon thereafter Burk knocked at the door of the victim's house, presented himself as a poll taker, and asked to be let in. When Mrs. Beeman asked for identification, he forced her into the hallway and entered. Gray, disguised in a ski mask, followed. The two subdued the victim, placed tape over her mouth and eyes and tied her to a bathroom fixture. Then they ransacked the house, taking numerous pieces of jewelry and a set of silverware. The jewelry included a 3.5 carat, heart-shaped diamond ring and a blue sapphire ring. The total value of these two rings was over $100,000. In the course of the robbery, telephone wires inside the house were cut.

Appellant was arrested six days later in Emeryville. He had in his possession several of the less valuable of the stolen rings. He supplied the police with information that led to the arrests of Burk and Gray. With Gray's cooperation appellant assisted police in recovering most of the stolen property.

Burk, Gray and appellant were jointly charged. After the trial court severed the trials, Burk and Gray pled guilty to robbery. At appellant's trial they testified that he had been extensively involved in planning the crime.

Burk testified that he had known appellant for two and one-half years. He had lived in appellant's apartment several times. Appellant had talked to him about rich relatives in Redding and had described a diamond ring worth $50,000. According to Burk the feasibility of robbing appellant's relatives was first mentioned two and one-half months before the incident occurred. About one week before the robbery, the discussions became more specific. Appellant gave Burk the address and discussed the ruse of posing as a poll taker. It was decided that Gray and Burk would go to Redding because appellant wanted nothing to do with the actual robbery and because he

feared being recognized. On the night before the offense appellant drew a floor plan of the victim's house and told Burk where the diamond ring was likely to be found. Appellant agreed to sell the jewelry for 20 percent of the proceeds.

After the robbery was completed, Burk telephoned appellant to report success. Appellant said that he would call the friend who might buy the jewelry. Burk and Gray drove to appellant's house and showed him the "loot." Appellant was angry that the others had taken so much jewelry, and demanded that his cut be increased from 20 percent to one-third.

Gray's testimony painted a similar picture. Gray also had known appellant for approximately two years prior to the incident. Gray said Burk had initially approached him about the robbery, supplied the victim's address, and described the diamond ring. Appellant had at some time described the layout of the house to Gray and Burk and had described to them the cars driven by various members of the victim's family. Gray and Burk, but not appellant, had discussed how to divide the proceeds. Both Gray and Burk owed money to appellant. In addition, Burk owed Gray $3,200.

According to Gray appellant had been present at a discussion three days before the robbery when it was mentioned that appellant could not go because his 6 foot 5 inch, 310-pound frame could be too easily recognized. Two days before the offense, however, appellant told Gray that he wanted nothing to do with the robbery of his relatives. On the day preceding the incident appellant and Gray spoke on the telephone. At that time appellant repeated he wanted nothing to do with the robbery, but confirmed that he had told Burk that he would not say anything if the others went ahead.

Gray confirmed that appellant was upset when he saw that his friends had gone through with the robbery and had taken all of the victim's jewelry. He was angered further when he discovered that Burk might easily be recognized because he had not disguised himself. Appellant then asked them to give him all of the stolen goods. Instead Burk and Gray gave appellant only a watch and some rings which they believed he could sell. Gray and Burk then travelled to San Jose where they sold the silverware for $900. Burk used this money to flee to Los Angeles. Sometime later appellant asked for Gray's cooperation in recovering and returning the property to the victim. On several occasions when Burk called them for more money, appellant stalled and avoided questions about the sale of the jewelry.

Appellant Beeman's testimony contradicted that of Burk and Gray as to nearly every material element of his own involvement. Appellant testified that he did not participate in the robbery or its planning. He confirmed that

Burk had lived with him on several occasions, and that he had told Burk about Mrs. Beeman's jewelry, the valuable diamond ring, and the Beeman ranch, in the course of day-to-day conversations. He claimed that he had sketched a floor plan of the house some nine months prior to the robbery, only for the purpose of comparing it with the layout of a house belonging to another brother. He at first denied and then admitted describing the Beeman family cars, but insisted this never occurred in the context of planning a robbery.

Appellant stated that Burk first suggested that robbing Mrs. Beeman would be easy some five months before the incident. At that time, and on the five or six subsequent occasions when Burk raised the subject, appellant told Burk that his friends could do what they wanted but that he wanted no part of such a scheme.

Beeman admitted Burk had told him of the poll taker ruse within a week before the robbery, and that Burk told him they had bought a cap gun and handcuffs. He further admitted that he had allowed Burk to take some old clothes left at the apartment by a former roommate. At that time Beeman told Burk: "If you're going to do a robbery, you can't look like a bum." Nevertheless, appellant explained that he did not know Burk was then planning to commit this robbery. Further, although he knew there was a possibility Burk and Gray would try to rob Mrs. Beeman, appellant thought it very unlikely they would go through with it. He judged Burk capable of committing the crime but knew he had no car and no money to get to Redding. Appellant did not think Gray would cooperate.

Appellant agreed that he had talked with Gray on the phone two days before the robbery, and said he had then repeated he did not want to be involved. He claimed that Burk called him on the way back from Redding because he feared appellant would report him to the police, but knew appellant would want to protect Gray, who was his closer friend.

Appellant claimed he told the others to come to his house after the robbery and offered to sell the jewelry in order to buy time in which to figure out a way to collect and return the property. He took the most valuable piece to make sure it was not sold. Since Burk had a key to his apartment, appellant gave the diamond ring and a bracelet to a friend, Martinez, for safekeeping.[1] After Burk fled to Los Angeles, appellant showed some of the jewelry to mutual acquaintances in order to lull Burk into believing he was attempting to sell it. During this time Burk called him on the phone several times

---

[1]Martinez corroborated that appellant had given him a diamond ring and other jewelry belonging to appellant's family for this purpose.

asking for money and, when appellant told him of plans to return the property, threatened to have him killed.

When confronted with his prior statement to the police that he had given one of the rings to someone in exchange for a $50 loan, appellant admitted making the statement but denied that it was true. He also claimed that his statement on direct examination that "his [Burk's] face was seen. He didn't wear a mask. Didn't do anything he was supposed to do. . . ." referred only to the reason Gray had given for wanting to return the victim's property.

Appellant requested that the jury be instructed in accord with *People* v. *Yarber* (1979) 90 Cal.App.3d 895 [153 Cal.Rptr. 875] that aiding and abetting liability requires proof of intent to aid. The request was denied.

After three hours of deliberation, the jury submitted two written questions to the court: "We would like to hear again how one is determined to be an accessory and by what actions can he absolve himself"; and "Does inaction mean the party is guilty?" The jury was reinstructed in accord with the standard instructions, CALJIC Nos. 3.00 and 3.01. The court denied appellant's renewed request that the instructions be modified as suggested in *Yarber,* explaining that giving another, slightly different instruction at this point would further complicate matters. The jury returned its verdicts of guilty on all counts two hours later.

I

■ Penal Code section 31 provides in pertinent part: "All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed." Thus, those persons who at common law would have been termed accessories before the fact and principals in the second degree as well as those who actually perpetrate the offense, are to be prosecuted, tried and punished as principals in California. (See Pen. Code, § 971.)[2] The term "aider and abettor" is now often used to refer to

---

[2]The major purpose and effect of this abrogation of the common law distinction between parties to crime apparently has been to alleviate certain procedural difficulties. For instance, at common law an accessory before the fact was punishable where the incitement occurred while the principals were punishable where the offense occurred; one could not be convicted as an accessory if charged as a principal and vice versa; an accessory could not be tried before the principal had been found guilty. (See generally, Perkins, Criminal Law (1982) pp. 751-757.) Now, as at common law, one who is found guilty of the same offense on a theory of aiding and abetting while present at the scene of the crime, or conspiring with the perpetrator beforehand or instigating, encouraging, or advising commission of the crime, is subject to the same punishment as the one who with the requisite criminal intent commits the crime by his or her own acts.

principals other than the perpetrator, whether or not they are present at the commission of the offense.

CALJIC No. 3.00 defines principals to a crime to include "Those who, with knowledge of the unlawful purpose of the one who does directly and actively commit or attempt to commit the crime, aid and abet in its commission . . ., or . . . Those who, whether present or not at the commission or attempted commission of the crime, advise and encourage its commission. . . ." CALJIC No. 3.01 defines aiding and abetting as follows: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime."

Prior to 1974 CALJIC No. 3.01 read: "A person aids and abets the commission of a crime if he knowingly and with criminal intent aids, promotes, encourages or instigates by act or advice, or by act and advice, the commission of such crime." (See, *People* v. *Cabral* (1975) 51 Cal.App.3d 707, 714, fn. 5 [124 Cal.Rptr. 418].)

Appellant asserts that the current instructions, in particular CALJIC No. 3.01, substitute an element of knowledge of the perpetrator's intent for the element of criminal intent of the accomplice, in contravention of common law principles and California case law. He argues that the instruction given permitted the jury to convict him of the same offenses as the perpetrators without finding that he harbored either the same criminal intent as they, or the specific intent to assist them, thus depriving him of his constitutional rights to due process and equal protection of the law. Appellant further urges that the error requires reversal because it removed a material issue from the jury and on this record it is impossible to conclude that the jury necessarily resolved the same factual question that would have been presented by the missing instruction. (*People* v. *Modesto* (1963) 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 720 [112 Cal.Rptr. 1, 518 P.2d 913].)

The People argue that the standard instruction properly reflects California law, which requires no more than that the aider and abettor have knowledge of the perpetrator's criminal purpose and do a voluntary act which in fact aids the perpetrator. (Relying on, e.g., *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335]; *People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Standifer* (1974) 38 Cal.App.3d 733, 743-744 [113 Cal.Rptr. 653].) The People further contend that defendants are adequately protected from conviction for acts committed under duress or which inadvertently aid a perpetrator by the limitation of the liability of an aider and abettor to those acts

knowingly aided and their natural and reasonable consequences. (*People* v. *Beltran* (1949) 94 Cal.App.2d 197, 205 [210 P.2d 238]; *People* v. *King* (1938) 30 Cal.App.2d 185, 203 [85 P.2d 928].) Finally, the People argue that the modification proposed by *Yarber, supra,* is unnecessary because proof of intentional aiding in most cases can be inferred from aid with knowledge of the perpetrator's purpose. Thus, respondent argues, it is doubtful that the requested modification would bring about different results in the vast majority of cases.

II

■ There is no question that an aider and abettor must have criminal intent in order to be convicted of a criminal offense. (Pen. Code, § 20; *People* v. *Tewksbury, supra,* 15 Cal.3d 953; Perkins, Criminal Law, *op. cit. supra,* pp. 751-757.) Decisions of this court dating back to 1898 hold that "the word 'abet' includes knowledge of the wrongful purpose of the perpetrator and counsel and encouragement in the crime" and that it is therefore error to instruct a jury that one may be found guilty as a principal if one aided *or* abetted. (*People* v. *Dole* (1898) 122 Cal. 486, 492 [55 P. 581]; accord, *People* v. *Compton* (1899) 123 Cal. 403, 412 [56 P. 44]; *People* v. *Best* (1941) 43 Cal.App.2d 100, 105 [110 P.2d 504]; *People* v. *Etie* (1953) 119 Cal.App.2d 23, 29 [258 P.2d 1069].) The act of encouraging or counseling itself implies a purpose or goal of furthering the encouraged result. ■ "An aider and abettor's fundamental purpose, motive and intent is to aid and assist the perpetrator in the latter's commission of the crime." (*People* v. *Vasquez* (1972) 29 Cal.App.3d 81, 87 [105 Cal.Rptr. 181].)

The essential conflict in current appellate opinions is between those cases which state that an aider and abettor must have an intent or purpose to commit or assist in the commission of the criminal offenses (*People* v. *Yarber, supra,* 90 Cal.App.3d 895; *People* v. *Petty* (1981) 127 Cal.App.3d 255 [179 Cal.Rptr. 413]; see also *People* v. *Terry, supra,* 2 Cal.3d 362, 402; *People* v. *Vasquez, supra,* 29 Cal.App.3d 81; *People* v. *King, supra,* 30 Cal.App.2d 185), and those finding it sufficient that the aider and abettor engage in the required acts with knowledge of the perpetrator's criminal purpose (*People* v. *Ott* (1978) 84 Cal.App.3d 118 [148 Cal.Rptr. 479]; *People* v. *Standifer, supra,* 38 Cal.App.3d 733; *People* v. *Tambini* (1969) 275 Cal.App.2d 757 [80 Cal.Rptr. 179]; *People* v. *Masters* (1963) 219 Cal.App.2d 672 [33 Cal.Rptr. 383]; *People* v. *Belenger* (1963) 222 Cal.App.2d 159 [34 Cal.Rptr. 918]; *People* v. *Ellhamer* (1962) 199 Cal.App.2d 777 [18 Cal.Rptr. 905]).[3]

---

[3]Some cases which take the latter viewpoint intimate that the aider and abettor must also know that his acts will probably facilitate the perpetrator's commission of the offense. (See *People* v. *Tewksbury, supra,* 15 Cal.3d 953, 960; *People* v. *Belenger, supra,* 222 Cal.App.2d 159, 166.)

The cases most often cited for the view that knowledge of the perpetrator's wrongful purpose is sufficient are *People* v. *Terry,* 2 Cal.3d 362, *People* v. *Ott,* 84 Cal.App.3d 118, *People* v. *Standifer,* 38 Cal.App.3d 733, and *People* v. *Ellhamer,* 199 Cal.App.2d 777, all *supra. Terry* and *Standifer* are said to have been catalysts for the transmutation of CALJIC No. 3.01 from its pre-1974 to its present form. (See *People* v. *Cabral* (1975) 51 Cal.App.3d 707, 714, fn. 6 [124 Cal.Rptr. 418].) As we shall explain, however, we believe this is a misconstruction of *Terry.* Neither that opinion nor the weight of accepted authority supports the definition of aiding and abetting embodied in the current version of CALJIC No. 3.01.

In *Terry* this court held that an accomplice to robbery-murders need not have the intent to take the victims' property: "She was an aider or abettor if, with knowledge of Terry's criminal purpose, she encouraged, promoted, or assisted in the commission of the crimes. [Citations.] One who aids and abets does not necessarily have the intention of enjoying the fruits of the crime. [Citation.]" (2 Cal.3d at p. 401.)

Relying on this language the Court of Appeal in *Standifer* rejected the defendant's contention that he must be found to have the same criminal intent as the perpetrator. The court held an instruction calling for a finding of "required" as opposed to "criminal" intent proper: ". . . we feel the test is 'did the defendant aid and abet the perpetrator with knowledge of the perpetrator's criminal intent.' (See *People* v. *Terry, supra,* 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961].)" (38 Cal.App.3d at p. 744.)

The subsequent *Ellhamer* and *Ott* decisions explain the reasoning process behind the theory that knowledge is all that is required: ". . . the criminal intent of the aider and abettor is presumed from his actions with knowledge of the actor's wrongful purpose. [Citations.]" (*People* v. *Ellhamer, supra,* 199 Cal.App.2d at p. 782; *People* v. *Ott, supra,* 84 Cal.App.3d at p. 130.) In *Ott* the court specifically upheld the current version of CALJIC Nos. 3.00 and 3.01 against the argument that they omit the element of criminal intent.

The reasoning of *Ellhamer* and *Ott* has been forcefully and correctly criticized by a number of subsequent Court of Appeal opinions which find that the weight of authority requires an aider and abettor to have an intent or purpose to commit or assist in commission of the underlying offense. The leading case is *People* v. *Yarber, supra,* 90 Cal.App.3d 895, which explained that "[t]he *Ellhamer/Ott* synthesis that intent is inferred from the knowledge by the aider and abettor of the perpetrator's purpose is sound, generally, as a matter of human experience, but we cannot extrapolate therefrom, as a matter of law, that the inference *must* be drawn. Intent is what

must be *proved;* from a person's action with knowledge of the purpose of the perpetrator of a crime, his intent to aid the perpetrator can be *inferred.* In the absence of evidence to the contrary, the intent may be regarded as established. But where a contrary inference is reasonable—where there is room for doubt that a person intended to aid a perpetrator—his knowledge of the perpetrator's purpose will not suffice." (Fn. omitted; original italics.) (90 Cal.App.3d at p. 916.)

This court has not addressed the intent of an aider and abettor since the *Yarber* opinion. We last considered the issue in *People* v. *Tewksbury, supra,* 15 Cal.3d 953. There we relied on our earlier opinion in *People* v. *Terry, supra,* 2 Cal.3d 362, to distinguish the criminal intent required of an aider and abettor from that required of the perpetrator. "Although it is undisputed that Mary aided appellant by calling the restaurant, by supplying Sheila with pencil and paper, and by driving some of the principals to a point of rendezvous in the vicinity of the crimes, such actions do not confer upon her accomplice status unless she also acted with the requisite guilty intent. She need not have actually had the specific intent to commit a robbery however; the intent requirement is satisfied if Mary, prior to its commission, realized that a robbery was being planned and that she was facilitating its commission. (*People* v. *Terry* (1970) 2 Cal.3d 362, 401 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Germany* (1974) 42 Cal.App.3d 414, 420 [116 Cal.Rptr. 841].)" (15 Cal.3d at p. 960.)

Contrary to the argument of the Attorney General, we do not read the language of the last clause as a signal of agreement with the *Ellhamer-Standifer-Ott* line of cases. It requires that in addition to knowing of the perpetrator's criminal purpose the aider and abettor *at least realize* he or she is aiding commission of the crime. Moreover, the opinion states the general legal principles governing accomplice liability in the language of the older pre-1974 cases: "Criminal liability as a principal attaches to those who aid in the commission of a crime only if they also share in the criminal intent (Pen. Code, § 20; see also *Pinell* v. *Superior Court* (1965) 232 Cal.App.2d 284, 287 [42 Cal.Rptr. 676]) or, in the language of section 31, abet the crime. [Fn. omitted.] Mary was thus an accomplice only if at the time she acted she had 'guilty knowledge and intent with regard to the commission of the crime.' (*People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103].)" (*People* v. *Tewksbury, supra,* 15 Cal.3d at p. 960.)

■ We agree with the *Yarber* court that the facts from which a mental state may be inferred must not be confused with the mental state that the prosecution is required to prove. Direct evidence of the mental state of the accused is rarely available except through his or her testimony. The trier of

fact is and must be free to disbelieve the testimony and to infer that the truth is otherwise when such an inference is supported by circumstantial evidence regarding the actions of the accused. Thus, an act which has the effect of giving aid and encouragement, and which is done with knowledge of the criminal purpose of the person aided, may indicate that the actor intended to assist in fulfillment of the known criminal purpose. However, as illustrated by *Hicks* v. *U.S.* (1893) 150 U.S. 442 [37 L.Ed. 1137, 14 S.Ct. 144] (conviction reversed because jury not instructed that words of encouragement must have been used with the intention of encouraging and abetting crime in a case where ambiguous gesture and remark may have been acts of desperation) and *People* v. *Bolanger* (1886) 71 Cal. 17 [11 P. 799] (feigned accomplice not guilty because lacks common intent with the perpetrator to unite in the commission of the crime), the act may be done with some other purpose which precludes criminal liability.

If the jury were instructed that the law conclusively presumes the intention of the accused solely from his or her voluntary acts, it would " 'effectively eliminate intent as an ingredient of the offense' " and would " 'conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime.' " (*Sandstrom* v. *Montana* (1979) 442 U.S. 510, 522 [61 L.Ed.2d 39, 49-50, 99 S.Ct. 2450], quoting from *Morissette* v. *United States* (1952) 342 U.S. 246, 274-275 [96 L.Ed. 288, 306-307, 72 S.Ct. 240]; original italics omitted.) Where an appellate court employs the same presumption to support the adequacy of a jury instruction, the reviewing court announces its willingness to permit a conviction to stand regardless of whether the trier of fact has found the required criminal intent. Thus at the appellate level, the element of criminal intent is effectively eliminated as an ingredient of the offense.

This court's *Terry* decision comports with long established law and does not stand for the proposition that the sole mental element of aiding and abetting is knowledge of the wrongful purpose of the perpetrator. The accomplice there was convicted of two counts of first degree murder for her role in two robbery-murders. In addition to the often quoted language discussed *ante* at page 557, we held it error to refuse a requested instruction that her specific intent to commit a robbery could not be inferred merely because she was present where a robbery occurred, saying that "her presence [was] but one factor which, together with others, would support a finding that she had the specific intent to rob or to assist in robbery." (2 Cal.3d at pp. 401-402.)

Nor does *Tewksbury* hold to the contrary. Our statement there regarding satisfaction of the intent requirement may fairly be read to say that *proof* of

the aider and abettor's intent may be made by way of an inference from her volitional acts with knowledge of their probable consequences.

■ Thus, we conclude that the weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. (*People* v. *Terry, supra,* 2 Cal.3d at p. 402; *People* v. *Yarber, supra,* 90 Cal.App.3d at pp. 915-916; *People* v. *Vasquez, supra,* 29 Cal.App.3d at p. 87.)

When the definition of the offense includes the intent to do some act or achieve some consequence beyond the *actus reus* of the crime (see *People* v. *Hood* (1969) 1 Cal.3d 444, 456-457 [82 Cal.Rptr. 618, 462 P.2d 370]), the aider and abettor must share the specific intent of the perpetrator. By "share" we mean neither that the aider and abettor must be prepared to commit the offense by his or her own act should the perpetrator fail to do so, nor that the aider and abettor must seek to share the fruits of the crime. (See *People* v. *Terry, supra,* at p. 401.) Rather, an aider and abettor will "share" the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime. (See *People* v. *Terry, supra;* Model Pen. Code, § 2.06; generally, Perkins, Criminal Law, *supra,* at pp. 662-663.) The liability of an aider and abettor extends also to the natural and reasonable consequences of the acts he knowingly and intentionally aids and encourages. (*People* v. *Beltran, supra,* 94 Cal.App.2d 197, 207.)

■ CALJIC No. 3.01 inadequately defines aiding and abetting because it fails to insure that an aider and abettor will be found to have the required mental state with regard to his or her own act. While the instruction does include the word "abet," which encompasses the intent required by law, the word is arcane and its full import unlikely to be recognized by modern jurors. Moreover, even if jurors were made aware that "abet" means to encourage or facilitate, and implicitly to harbor an intent to further the crime encouraged, the instruction does not *require* them to find that intent because it defines an aider and abettor as one who "aids, promotes, encourages *or* instigates" (italics added). Thus, as one appellate court recently recognized, the instruction would "technically allow a conviction if the defendant knowing of the perpetrator's unlawful purpose, negligently or accidentally aided the commission of the crime." (*People* v. *Patrick* (1981) 126 Cal.App.3d 952, 967, fn. 10 [179 Cal.Rptr. 276].)

Both the instruction suggested by *Yarber, supra,* 90 Cal.App.3d 895, 912 ("A person aids and abets the commission of a crime if, with knowledge of

the unlawful purpose of the perpetrator of the crime, he intentionally aids, promotes, encourages or instigates by act or advice the commission of such crime") and the version of CALJIC used prior to 1974 ("A person aids and abets the commission of a crime if he knowingly and with criminal intent aids, promotes, encourages or instigates by act or advice, or by act and advice, the commission of such crime") seek to include the required intent element. However, both are sufficiently ambiguous to conceivably permit conviction upon a finding of an intentional act which aids, without necessarily requiring a finding of an intent to encourage or facilitate the criminal offense. We suggest that an appropriate instruction should inform the jury that a person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.

### III

■ Appellant urges both that the erroneous instruction requires reversal under *People* v. *Modesto, supra,* 59 Cal.2d 722 and *People* v. *Sedeno, supra,* 10 Cal.3d 703, 720, and that the erroneous instructions created a presumption of intent which violates due process and requires automatic reversal of the conviction pursuant to *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450]. (See *People* v. *Hedrick* (1980) 105 Cal.App.3d 166, 171 [164 Cal.Rptr. 169].)[4]

Respondent urges that any instructional error was harmless whether the standard for normal (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]) or for constitutional error (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]) is applied. Respondent argues that the jury clearly found that appellant knew his accomplices' purpose was to rob his sister-in-law and rejected his testimony that he did not in fact assist them. Thus, the only reasonable inference from the evidence was that appellant intentionally aided the actual perpetrators.

---

[4]In *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969] the United States Supreme Court split four to four on the question of whether *Sandstrom* error requires reversal per se or may be reviewed for prejudice under the standard applicable to errors of federal constitutional dimension (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]). While the error which flows from the giving of CALJIC No. 3.01 is not identical to a conclusive presumption or to placing the burden of persuasion on the defendant (cf. *Connecticut* v. *Johnson, supra,* 460 U.S. at pp. 78-79 [74 L.Ed.2d at pp. 828-829, 103 S.Ct. at p. 973]), it is just as effective—if not more effective—in removing the issue of intent from the jury's consideration. (Cf. *Connecticut* v. *Johnson, supra,* 460 U.S. at p. 95 [74 L.Ed.2d at p. 839, 103 S.Ct. at p. 982, dissenting opinion of Justice Powell.)

We do not agree with respondent's assessment of the effect of the error. Correct instruction on the element of intent was particularly important in this case because appellant's defense focused on the question of his intent more than on the nature of his acts. The prosecution produced considerable evidence which showed that appellant in fact aided the robbery. The prosecution's evidence also sought to show that he had participated extensively in the planning of the robbery and agreed beforehand to sell the jewelry for a percentage of its value, but refused to be present when the offenses were committed.

Appellant did not deny that he had given information to Burk and Gray which aided their criminal enterprise, but he claimed his purposes in doing so were innocent.[5] Appellant admitted that he was at some time made aware of his friends' intent to rob Mrs. Beeman, but insisted that he had repeatedly stated that he wanted nothing to do with a robbery of his relatives. He testified that he didn't think Burk would really go through with the robbery or that Gray would help. Two days before the incident, he again told Gray that he didn't want to be involved. Gray's testimony confirmed that appellant had twice said he did not want to be involved. Finally, appellant claimed to have taken possession of the jewelry and feigned attempts to sell it in order to recover the property and return it to the victims. Thus, the essential point of his defense was that although he acted in ways which in fact aided the criminal enterprise, he did not act with the intent of encouraging or facilitating the planning or commission of the offenses.

The jury certainly could have believed Burk and Gray while disbelieving appellant, and thus found that appellant intentionally aided and encouraged his friends in their crimes. However, the fact that the jury interrupted its deliberations to seek further instruction regarding accomplice liability indicates that the jurors did not dismiss appellant's testimony out of hand. Rather, the questions asked indicate the jury's deliberations were focused on the very issue upon which the defense rested and upon which the court's instructions were inadequate: the elements—including the mental element—of aiding and abetting.[6] When it reinstructed the jury according to the standard instructions and again refused the *Yarber* modification requested by appellant, the court repeated its original mistake.

Under these circumstances, where the defense centered on the very element as to which the jury was inadequately instructed and the jurors' com-

---

[5] He testified that he had mentioned the victim's jewels and car only casually and that he had drawn the floor plan only for the purpose of discussing the design of the house.

[6] The jury submitted the following questions:

"We would like to hear again how one is determined to be an accessory and by what actions can he absolve himself?" and "Does inaction mean the party is guilty?"

munication to the court indicated confusion on the same point, we cannot find the error harmless. Even applying the most lenient *Watson* standard, we find that in this case it is reasonably probable that the jury would have reached a result more favorable to appellant had it been correctly instructed upon the mental element of aiding and abetting. (*People* v. *Watson, supra,* 46 Cal.2d 818.) Because we reverse under *Watson* we do not in this case decide whether failure to correctly instruct on the element of criminal intent should as a general rule be reviewed under a stricter rule of harmless error.

The convictions are reversed.

Bird, C. J., Mosk, J., Kaus, J., Broussard, J., and Sater, J.,* concurred.

**RICHARDSON, J.**† Concurring and Dissenting.—I concur in the court's conclusion that the jury instructions given in this case were inadequate because they failed to inform the jury that appellant could be guilty of aiding and abetting a crime only if he acted with the intent or purpose of committing, encouraging or facilitating the commission thereof.

I respectfully dissent, however, from the reversal of appellant's conviction. The verdicts clearly demonstrated that the jury disbelieved the testimony of appellant which would have supported a finding that he did not have the requisite criminal intent. Further, the record amply supports the conclusion that appellant acted knowingly and intentionally in encouraging and facilitating the commission of the offenses. Accordingly, the trial court's error in refusing to give the modified instruction sought by appellant was harmless and the conviction should be affirmed. (See *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243].)

---

*Assigned by the Chairperson of the Judicial Council.

†Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.