Filed 6/27/23  P. v. Aguilera CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAVIER ALFREDO AGUILERA,<br><br>    Defendant and Appellant. | B321572<br>(Los Angeles County<br> Super. Ct. No. BA150865) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Renee F. Korn, Judge.  Affirmed.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, William H. Shin and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Javier Alfredo Aguilera (defendant) in 2000 of first degree murder, premeditated attempted murder, and assault with a deadly weapon. This court affirmed the judgment of conviction in 2001. (*People v. Aguilera* (Dec. 11, 2001, B144894) [nonpub. opn.].) In 2020, defendant filed a petition for resentencing under former Penal Code section 1170.95 (now section 1172.6),[1] which permits persons convicted of murder under a natural and probable consequences theory to petition the sentencing court to vacate their convictions and resentence them. (§ 1172.6, subd. (a).) On May 23, 2022, the trial court denied defendant's petition after conducting an evidentiary hearing.

We affirm the trial court's order.

## PROCEDURAL BACKGROUND

On May 4, 2000, a jury found defendant guilty of first degree murder (§ 187, subd. (a), count 1), premeditated attempted murder (§§ 664/187, subd. (a), count 3), and assault with a deadly weapon (§ 245, subd. (a)(1), count 4). The jury further found defendant used a firearm in the commission of count 1. The trial court found defendant served two prior prison terms (§ 667.5, subd. (b)) and sentenced defendant to 25 years to life on count 1, plus 10 years for the firearm enhancement, a consecutive term of life with possibility of parole for count 3, and two additional years for the prior prison terms. Count 4 was stayed pursuant to section 654. This court affirmed the

---

[1]     Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no significant change in text. (Stats. 2022, ch. 58, § 10.) We will refer to the section by its new numbering only. All further statutory references are to the Penal Code.

judgment with minor modifications to the sentence. (*People v. Aguilera, supra,* B144894.)

In 2020, defendant filed a petition for resentencing, arguing the jury in his 2000 trial had been instructed on aiding and abetting murder under the natural and probable consequence doctrine, entitling him to relief under section 1172.6.[2] Although the jury was not instructed on aider and abettor culpability or the natural and probable consequences theory on the attempted murder charge, defendant claimed the prosecutor had presented both theories of culpability to the jury on the attempted murder charge during closing argument.

The trial court concluded defendant had made a prima facie case for relief and issued an order to show cause. After holding an evidentiary hearing in which the trial court reviewed the available minute orders and

---

[2] The jury was instructed on aiding and abetting murder pursuant to CALJIC No. 3.02 as follows: "One who aids and abets another in the commission of a crime or crimes is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted. [¶] In order to find the defendant guilty of the crime of murder, as charged in Count One, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of assault with force likely to cause great bodily injury was committed; [¶] 2. That the defendant aided and abetted that crime; [¶] 3. That a co-principal in that crime committed the crime of murder; and [¶] 4. The crime of murder was a natural and probable consequence of the commission of the crime of assault with force likely to cause great bodily injury. [¶] Whether a consequence is 'natural and probable' is an objective test based not on what the defendant actually intended but on what a person of reasonable and ordinary prudence would have expected would be likely to occur. The issue is to be decided in light of all of the circumstances surrounding the incident. A 'natural consequence' is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened. 'Probable' means likely to happen." The jury was also instructed on direct aiding and abetting culpability pursuant to CALJIC Nos. 3.00 and 3.01.

3

reporter's transcripts from defendant's 2000 trial, the court denied defendant's petition, concluding beyond a reasonable doubt that defendant had aided and abetted the murder and attempted murder with both express and implied malice.

The trial court thereafter resentenced defendant pursuant to section 1170, subdivision (d), to 25 years to life for count 1, and a consecutive term of life with possibility of parole for count 3. The court stayed the sentences for the firearm enhancement, the prior prison term enhancements, and count 4.

On June 9, 2022, defendant filed a notice of appeal from the order denying his resentencing petition.

## FACTUAL BACKGROUND[3]

The Maravilla Project Boys (MPB), the Rascals Trece Maravilla (Rascals), and the High Times Stoners (High Times) were affiliated gangs[4] allied with one another. The Maravilla gangs were based at the Maravilla Housing Projects (the Projects) near Belvedere Park in East Los Angeles.

The Arizona Maravilla (Arizona) gang was a rival of the Maravilla gangs. Until April 1996, the Arizona and Maravilla gangs considered Belvedere Park as neutral territory. In April 1996, however, Arizona gang members began using graffiti as part of an effort to claim Belvedere Park as Arizona gang territory.

---

[3]    The relevant facts are taken from the reporter's transcript of defendant's 2000 trial.

[4]    The MBP, Rascals and High Times gangs are referred to collectively as the Maravilla gangs.

4

At 7:00 p.m. on April 30, 1996, Ruben Garcia (Ruben)[5] and Luis Olmos (Olmos), both MPB gang members, were playing handball at Belvedere Park when at least 15 Arizona gang members confronted them. One of the Arizona gang members accused Ruben and Olmos of crossing out Arizona gang graffiti, a means of disrespecting the gang. Although Ruben and Olmos denied doing so, the Arizona group attacked them, beating them before Ruben and Olmos fled to the Projects. There, they entered the home of Debbie Arellano (Arellano). Defendant, a Rascals gang member, was present in the home, along with Maravilla gang members Jose Sandoval (Sandoval), Alexander Dukes (Dukes), Hector Guillen (Hector), Ralph Guillen (Ralph), and Ezekiel Ordaz (Ordaz). Arellano and Iris Serrano were also present.

When Ruben and Olmos disclosed what had happened to them, Sandoval told the others that they should go to Belvedere Park and seek retribution. Ruben, Olmos, and Hector grabbed knives from Arellano's kitchen, and the group ran to the park. Ruben testified at the trial that he returned to the park intending to hurt and possibly kill Arizona gang members.

When the group arrived at the park, they saw Arizona gang members Manuel Chavez (Chavez) and Manuel Garcia (Garcia) and attacked them. Ruben testified that he and Dukes beat Garcia with their fists. Ruben saw Olmos stab Chavez while Hector stood nearby with a knife in his hand. Chavez fell to his knees while trying to protect his face and chest. Defendant then walked over and shot Chavez in the head with a small caliber chrome semiautomatic handgun. Defendant was less than two feet away from

---

[5]     Because Ruben Garcia and one of the victims, Manuel Garcia, share the same surname, we refer to Ruben Garcia by his first name to avoid confusion.

Chavez when he fired his gun. Ruben saw Dukes shoot at Chavez with a larger caliber handgun from approximately seven feet away. Chavez sustained four stab wounds, three fatal. Chavez also suffered one non-fatal gunshot wound under his right eye that did not strike any vital organs. The forensic evidence showed that he had been shot from no more than two feet away. Chavez died as a result of the stab wounds.

After the shots were fired, the entire group fled from the park and returned to the Projects. The perpetrators met in the parking lot, where Olmos and Hector handed Ruben their knives and the shirt Olmos had been wearing, which was covered in blood. Ruben wrapped the two knives, along with the knife he had taken to the park, in the bloody shirt and gave them to Marcelo Rodriguez, who said he would get rid of them. Defendant and Dukes then gave Ruben their guns and asked him to get rid of them. Ruben gave the guns to Sandoval with instructions to dispose of them.

Ordaz was a MPB and High Time gang member and went to Belvedere Park with other Maravilla gang members on the day of the crimes. He testified at trial as a reluctant witness and denied seeing anyone shoot Chavez. Ordaz's testimony was impeached with statements he gave to the police, as well as his testimony in a previous trial involving other perpetrators. Ordaz told police officers that he, Ruben, Hector, and Dukes beat Garcia. A couple of feet away from him, Ordaz saw defendant, Olmos, and Sandoval beating Chavez. Ordaz then saw defendant shoot Chavez with a handgun.

Garcia testified at the trial that he and Chavez were at Belvedere Park on April 30, 1996. Garcia knew that an altercation between Arizona and Maravilla gang members had occurred earlier that day. He told Chavez that they should leave the park before the Maravilla gang members returned.

6

Garcia and Chavez did not have time to leave because multiple Maravilla gang members soon surrounded them. Garcia was hit in the back of the head. He fell forward onto the ground and was kicked three times. Multiple people were beating him, and he lost consciousness.

Iris Serrano also testified at trial as a reluctant witness. She denied knowing defendant and denied knowing anything about the crimes. She was impeached with a signed statement she gave to the police. In her written statement, Serrano stated she was present in Arellano's apartment when defendant and Dukes returned from the park after the crimes, covered in blood. Defendant washed himself in Arellano's kitchen sink.

Gang expert Anthony Rivera testified that he was familiar with the gangs in the Maravilla Projects. He stated that the MPB, Rascals and High Time gang members all got along, and that he considered each of those gangs as the same when investigating crimes. Rivera further testified that there was tension between the Maravilla and Arizona gangs in April 1996.

## CONTENTIONS ON APPEAL

Defendant raises the following contentions on appeal:

1. De novo review applies to the trial court's denial of defendant's resentencing petition.

2. The trial court failed to identify specific conduct by defendant that aided and abetted Chavez's murder.

3. There was insufficient evidence that defendant aided and abetted Garcia's attempted murder.

4. An aider and abettor cannot be held culpable for implied malice murder.

7

5. The trial court had the authority to reduce defendant's first degree murder conviction to second degree murder and erred by denying defendant's request to do so.

**DISCUSSION**

I. *Resentencing Under Section 1170.95*

The Legislature enacted Senate Bill No. 1437 (SB 1437), which became effective on January 1, 2019, "to amend the felony murder rule and the natural and probable consequences doctrine,[6] as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) SB 1437 amended section 188, which defines malice, and section 189, which defines the degrees of murder, to address felony-murder liability. Section 188 now requires, when the felony-murder rule does not apply, that a principal in the crime of murder "shall act with malice aforethought" and "[m]alice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).) With one exception not applicable here,[7] SB 1437 effectively eliminated murder convictions premised on a theory of imputed malice—that is, any theory by which a person can be convicted of murder for a killing committed by someone else, such as felony

---

[6] Under the natural and probable consequences doctrine, an aider and abettor of criminal conduct is guilty of not only the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." (*People v. Chiu* (2014) 59 Cal.4th 155, 158 (*Chiu*).)

[7] That exception is set forth in section 189, subdivision (f), which applies to the killing of a police officer.

8

murder or the natural and probable consequences doctrine—unless the prosecutor also proves that the nonkiller defendant personally acted with the intent to kill or was a major participant who acted with reckless disregard to human life.  (§§ 188, subd. (a)(3) & 189, subd. (e).)

SB 1437 also added what is now section 1172.6, providing a procedure by which defendants whose cases are final can seek retroactive relief by petitioning the sentencing court to vacate the conviction and resentence on any remaining counts.  (§ 1172.6, subd. (a).)  The statute permits persons convicted of felony murder or murder under a natural and probable consequences theory to petition for relief.  (Stats. 2018, ch. 1015, § 4, subd. (a).)  Effective January 1, 2022, the Legislature expanded the scope of the petitioning procedure to allow persons convicted of attempted murder under the natural and probable consequences doctrine also to petition for relief. (Stats. 2021, ch. 551, § 2; § 1172.6, subd. (a); *People v. Saibu* (2022) 81 Cal.App.5th 709, 747.)

If a petitioner makes a prima facie showing of entitlement to relief, the trial court must issue an order to show cause.  (§ 1172.6, subd. (c).)  If the trial court determines the petitioner has made a prima facie showing for relief and issues an order to show cause, the court must hold a hearing "to determine whether to vacate the murder . . . conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence."  (Former § 1172.6, subd. (d)(1).)  At the hearing, the parties may rely on the record of conviction or present "new or additional evidence" to support their positions, and "the burden of proof shall be on the prosecution to prove, beyond a

reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended."  (§ 1172.6, subd. (d)(3).)

II.  *Standard of Review*

   A.  *Section 1172.6 Petition*

   Citing *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*) and *In re Cudjo* (1999) 20 Cal.4th 673 (*Cudjo*), defendant argues that because the trial court's adjudication of his resentencing petition was made on a "cold" record, i.e., based exclusively on the reporter's transcript of defendant's 2000 trial, we should independently review the denial of his petition.  We disagree.  Neither *Vivar* nor *Cudjo* addressed appellate review of a petition under section 1172.6.  Appellate courts that have done so have applied the substantial evidence standard.  (*People v. Oliver* (2023) 90 Cal.App.5th 466; *People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*); *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232–233; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590–591; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 985.)  As the court in *Clements* observed, an appellate court's review of a section 1172.6 petition "is different from the trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt."  (*Clements, supra,* 75 Cal.App.5th at p. 298.)

B. *Trial Court's Authority under Section 1172.6*

We review de novo appellant's contention that section 1172.6 should be construed to authorize the trial court to reduce defendant's first degree murder conviction to second degree murder. (*People v. Ramirez* (2019) 41 Cal.App.5th 923, 931 [construction of a statute is a question of law subject to de novo review on appeal].)

III. *Aider and Abettor Liability*

"A person who aids and abets the commission of a crime is culpable as a principal in that crime. (§ 31.) Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime." (*Gentile, supra,* 10 Cal.5th at p. 843.) Such derivative liability results from an act by the perpetrator to which the aider and abettor contributed. (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

"[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561 (*Beeman*).) "[A]ider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) As to the mens rea element, the

11

defendant must not only know the direct perpetrator's intent but also share that intent. (*Beeman, supra,* 35 Cal.3d at p. 560.)

Aiding and abetting may be shown by circumstantial evidence. It is well-settled that a defendant's presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense, including flight, are relevant to determining whether the defendant aided and abetted in the commission of the crime. (*People v. Lara* (2017) 9 Cal.App.5th 296, 322; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

A. *Substantial Evidence that Defendant Aided and Abetted Chavez's Murder*

First degree murder, as defined in section 189, includes any willful, deliberate, and premeditated killing. (§ 189, subd. (a).) Murder requires malice aforethought, which can be express or implied. (*Gentile, supra,* 10 Cal.5th at p. 844.) Malice is express when there is a manifest intent to kill. (§ 188, subd. (a)(1).) Express malice is shown when the assailant either desires the death or knows to a substantial certainty that death will occur. (§ 188, subd. (a)(1); *People v. Smith* (2005) 37 Cal.4th 733, 739.) Malice is implied when someone kills with "no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) Implied malice murder requires knowledge that conduct endangers the life of another and a conscious disregard for life. (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

SB 1437 "did not . . . alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.'" (*People v. Offley* (2020) 48 Cal.App.5th 588, 595–596.) "One who directly aids and abets

another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*Id.* at p. 596.)  For a defendant to be liable for first degree murder as a direct aider and abettor, "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu, supra*, 59 Cal.4th at p. 167.)

"[W]hen a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1122 (*McCoy*).)  This is because "the dividing line between the actual perpetrator and the aider and abettor is often blurred.  It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*Id.* at p. 1120.)  A person who "'chooses to become a part of the criminal activity of another'" accordingly "'says in essence, "your acts are my acts . . . ."'" [Citations.]" (*Id.* at p. 1118.)

Defendant contends the trial court erred by not identifying the specific acts he committed to assist the perpetrators in murdering Chavez.[8]  We disagree.  The trial court's ruling identifies several specific acts by defendant that assisted in the murder.  Defendant and the perpetrators, all affiliated Maravilla gang members who were hostile to the Arizona gang, went to

[8]     Defendant does not challenge the trial court's finding that he acted with express malice in aiding and abetting Chavez's murder, conceding that his shooting Chavez in the head at close range would support that finding.

13

Belvedere Park to exact violent revenge on rival Arizona gang members. Before leaving for the park, defendant armed himself with a .25 caliber firearm and the perpetrators armed themselves with knives. When the group arrived at Belvedere Park, they encountered Arizona gang members Chavez and Garcia and immediately attacked them. Defendant participated in beating Chavez. Olmos stabbed Chavez, who fell to his knees. Defendant then shot Chavez in the head from approximately two feet away with a .25 caliber semiautomatic handgun. Forensic evidence and eyewitness testimony confirmed that Chavez was still alive when defendant shot him, and that the shot was fired from no more than two feet. Investigators recovered a .25 caliber bullet from Chavez's body after his death.

After shooting Chavez, defendant and the other perpetrators fled. They met in a nearby parking lot, where they collectively arranged to dispose of their weapons. Defendant then went to Arellano's apartment, where he washed to remove blood from his body. Substantial evidence supports the trial court's finding that defendant's conduct before, during, and after the crimes made him culpable as an aider and abettor of murder. (*Beeman, supra,* 35 Cal.3d at p. 561.)

That defendant did not participate in stabbing Chavez, and that Chavez was fatally wounded when defendant shot him, does not preclude a finding that defendant aided and abetted Chavez's murder. Defendant had the requisite intent to kill, and his culpability as an aider and abettor of murder is determined by the combined acts of all the perpetrators. (*McCoy, supra,* 25 Cal.4th at p. 1122.) *People v. Pulido* (1997) 15 Cal.4th 713, cited by defendant in a footnote as support for his claim that he cannot be held culpable for Chavez's murder, is factually distinguishable and inapposite. The perpetrator in *Pulido*, acting alone, killed a person during commission of

14

a robbery. An accomplice thereafter aided and abetted the robbery by transporting and securing the stolen property. (*Id.* at p. 716.) The court in *Pulido* held that participation in the robbery did not subject the accomplice to murder liability because the killer and accomplice were not jointly engaged in a robbery at the time of the killing. (*Id.* at p. 716.) Here, in contrast, defendant and the perpetrators were jointly engaged in inflicting harm on Chavez with the intent to kill him.

The record does not support defendant's claim that he "came along after Chavez had already been killed." Defendant was armed and present throughout the crime. Defendant actively participated in beating Chavez, thereby disabling him and preventing him from fleeing. After Chavez had been stabbed but was still alive, defendant walked over and shot him in the head at close range. "'The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .""'" (See *People v. Smith, supra,* 37 Cal.4th at p. 741.)

Substantial evidence supports the trial court's finding that defendant was guilty of aiding and abetting Chavez's murder.

B. *Substantial Evidence that Defendant Aided and Abetted the Attempted Murder of Garcia*

Attempted murder requires "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Booker* (2011) 51 Cal.4th 141, 177–178.) An aider and abettor of attempted murder gives aid or encouragement to the perpetrator "with knowledge of the criminal purpose of the perpetrator *and* with an

15

intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*Beeman, supra,* 35 Cal.3d at p. 560.)

As we concluded in defendant's previous appeal (*People v. Aguilera, supra,* No. B144894), there is substantial evidence that the perpetrators intended to kill Garcia and that defendant shared that intent. Ruben's testimony that he went to the park to exact revenge on Arizona gang members and possibly kill someone; Ruben's testimony that he and others armed themselves with knives; and defendant's arming himself with a semiautomatic handgun evidence an intent to kill. Although Ruben and the others used their fists against Garcia instead of their weapons, they beat Garcia with sufficient force to cause him to lose consciousness.

Substantial evidence also supports the trial court's finding that defendant's conduct aided and abetted Garcia's attempted murder. Although defendant argues his "mere presence" at the scene of the crime is not sufficient to make him an aider and abettor, his presence is a circumstance that the trier of fact can consider in determining his guilt or innocence. (*People v. Durham* (1969) 70 Cal.2d 171, 181.) The circumstances here show defendant was not merely present at the scene of the crime, but that he also provided companionship, encouragement, and support to the perpetrators before, during, and after the attempted murder. Defendant armed himself with a semiautomatic handgun beforehand, and others in the group armed themselves with kitchen knives. When defendant and his companions encountered Garcia and Chavez, the group immediately attacked them. Defendant participated in beating Chavez. Olmos then stabbed him. At the same time, only two feet away, Ruben, Ordaz, Sandoval, Dukes, and Hector beat Garcia to unconsciousness. After defendant shot Chavez, he fled with the rest of the group. In a nearby parking lot, defendant and the other

16

perpetrators disposed of the weapons they had used to commit the crimes. Defendant and Dukes washed themselves in Arellano's home to remove blood from their bodies.

There was also evidence that defendant and the perpetrators were acting in unison as affiliated gang members. Although "gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime" (*People v. Guillen* (2014) 227 Cal.App.4th 934, 992), the expert and witness testimony about the Maravilla and Arizona gangs strengthened the inferences arising from other specific evidence concerning defendant's participation in the crimes. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 [expert's testimony that gang members in Orange County would drive around "'hunting for their rivals,'" that the defendant's gang was in a state of war with a rival gang, and the defendant's presence and conduct in a car at time of shooting, bolstered evidence of the defendant's involvement the crime].) Gang expert Anthony Rivera testified that the Maravilla gangs, including the Rascals gang to which defendant belonged, cooperated with one another and worked in unison. Rivera further testified that the Maravilla gangs were in conflict with the Arizona gang at the time of the crimes. Rivera's testimony was corroborated by Ruben and Ordaz, who confirmed that defendant belonged to the Rascals gang, was affiliated with the perpetrators' respective gangs, and that the affiliated Maravilla gangs were in conflict with the Arizonas. Ruben testified that he and the other perpetrators went to Belvedere Park to exact violent retribution for the savage beating Arizona gang members had inflicted on him. The evidence is sufficient to establish defendant's culpability as an aider and abettor of attempted murder.

C. *Aiding and Abetting Implied Malice Murder*

Defendant forfeited his appellate challenge to the trial court's finding he participated in Chavez's murder and Garcia's attempted murder with implied malice by failing to raise the claim in the trial court below. (*People v. Riggs* (2008) 44 Cal.4th 248, 292.) Defendant concedes he is unable to find any case authority to support an argument against such forfeiture.

Defendant argues his challenge raises a pure question of law and that we should exercise our discretion to consider it notwithstanding his forfeiture of the issue. Although an appellate court has discretion to consider an issue not raised in the trial court to the extent it presents a pure question of law or involves undisputed facts (*People v. Young* (2017) 17 Cal.App.5th 451, 463), we decline to do so here. As defendant notes, multiple Courts of Appeal have upheld the denial of resentencing petitions based on findings by the trial court that the petitioner acted with implied malice in aiding and abetting a murder. (*People v. Vargas* (2022) 84 Cal.App.5th 943, 953–954; *People v. Schell* (2022) 84 Cal.App.5th 437, 443; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 387–393; *People v. Cortes* (2022) 75 Cal.App.5th 198, 205.) We see no reason to depart from these appellate courts' holdings.

IV. *Reduction of Conviction to Second Degree Murder*

We reject defendant's contention that section 1172.6 may be construed to authorize the trial court to reduce defendant's first degree murder conviction to second degree murder. Nothing in the language of the statute authorizes the trial court to do so. The relief available under section 1172.6 is specific and narrowly circumscribed. Section 1172.6, subdivision (d)(3) states in part: "If the prosecution fails to sustain its burden of proof [that the petitioner is guilty of murder or attempted murder under California law as

18

amended SB 1437], the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).) That language is clear and unambiguous, and further statutory construction is unnecessary. (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007; *People v. Batt* (1994) 24 Cal.App.4th 1044, 1048.)

The relief defendant seeks is potentially available to him in a writ of habeas corpus. (*In re Martinez* (2017) 3 Cal.5th 1216, 1218, 1221–1222 [murder conviction may be collaterally attacked for error under *Chiu, supra,* 59 Cal.4th 155 through habeas petition].) Defendant filed a separate petition for a writ of habeas corpus in 2022, arguing that this court's 2001 opinion affirming his convictions compels a grant of relief under *Chiu, supra,* 59 Cal.4th 155. We address defendant's claim that he is eligible to have his conviction for first degree murder reduced to second degree murder in a separate order.

//
//
//
//
//
//
//
//
//
//

19

**DISPOSITION**

The order denying the petition for recall of sentence and resentencing under section 1172.6 is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                        ZUKIN, J.*

WE CONCUR:


CURREY, Acting P. J.


COLLINS, J.

---

*Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.