Filed 11/28/23  P. v. Portillo CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTONIO MENDOZA PORTILLO,<br><br>    Defendant and Appellant. | G061757<br><br>(Super. Ct. No. 07SF0318)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Richard M. King, Judge.  Affirmed.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christine Y. Friedman and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

**INTRODUCTION**

The addition of section 1170.95, now section 1172.6, to the Penal Code has generated a multitude of appeals since its passage in 2019.[1] Section 1172.6 provides a resentencing procedure for, amongst others, those offenders convicted of attempted murder under a natural and probable consequences theory. (*Id.*, subd. (a).) Such offenders are entitled to resentencing if (1) petitioner makes a prima facie showing of his eligibility for relief under the statute, and (2) after evidentiary hearing, the trial court determines the prosecution has not proven beyond a reasonable doubt that the petitioner is guilty of attempted murder under the updated versions of sections 188 and 189.

While this case presents a nebulous factual scenario, we conclude there was sufficient evidence for the trial court to conclude beyond a reasonable doubt that the appellant was guilty of attempted murder under a direct aiding and abetting theory. We thus affirm its denial of appellant's section 1172.6 petition.

**FACTS**

This case first came to us on direct appeal after appellant Antonio Mendoza Portillo was convicted in May 2010 of the attempted murder and assault of Joshua Lowe in front of a San Clemente 7-Eleven store. The incident occurred in March 2007 and Portillo was tried with codefendant Harvey Ulloa. We affirmed Portillo's conviction, holding there was substantial evidence to indicate Portillo was both present at the scene of, and involved in, the assault. (See *People v. Portillo* (Oct. 12, 2011, G043918) [nonpub. opn.].) The facts of the underlying crime were laid out in detail in our previous opinion. For purposes of the present appeal, we highlight only the facts relevant to the question of Portillo's potential culpability in the assault which occurred.

On or about March 18, 2007, Ysidro Hernandez was taking out the trash at the Los Patios restaurant in San Clemente when he was confronted by a group of four

---

[1] All further statutory references are to the Penal Code.

2

Hispanic men who exited a white Honda. The men asked him where he was from and made hand gestures at him. When he replied that he was from Mexico, they called him a "faggot" and knocked the cigarette out of his mouth. At that point, Hernandez's boss, Juan Frutos, appeared and told the men he didn't want any trouble. He asked them to leave. The males responded with "Shut the fuck up, asshole," and one of them threw a scooter in Frutos' direction. They then began running toward the 7-Eleven down the street. One of them threw a tiki torch at the restaurant as they left. After going inside briefly, Hernandez noticed that there was a commotion going on in front of the 7-Eleven.

The commotion involved a pedestrian named Joshua Lowe. Lowe testified he was approached by a group of men as he was walking from his girlfriend's house to the 7-Eleven around 9:45 p.m. to meet his brother. They asked him who he "represented" and if he "banged." The men were making hand gestures which Lowe did not understand. He told them he was from San Clemente and he did not bang. He walked away, but a few minutes later was rushed by the group of men and assaulted. At first, he could not be sure how many people were assaulting him, but he knew he was being punched and kicked by several people at the same time. As the fight moved towards the front of the 7-Eleven, Lowe recalled being thrown to the ground and noticing a total of seven people standing over him.

Lowe testified he was stabbed three times in the torso area. At least three different individuals in the group were wielding knives against him. He was trying to fight back and get the knives, and he could feel other people trying to restrain him and grab his arms. He managed to swing one of his arms and received a laceration on his arm for his trouble. At this point, the fight began to wind down, and Lowe saw the men run to the alley where two cars were parked. Four of them jumped into a white Honda. Three jumped into a green car. When the green car stopped at a red light, a man jumped out, ran back over to Lowe, kicked him and told him he should have died.

3

Only a few hours later, Hernandez was taken by police to a field lineup to try and identify some suspects who had been detained in a San Juan Capistrano garage. He recognized Portillo as one of the men who accosted and threatened to hit him in front of Los Patios restaurant, telling the officers, "Yeah, that's him." At the location of the field lineup, Hernandez was able to positively identify a white Honda as the one he had seen in front of the restaurant earlier that evening. A crime scene technician later discovered a crumpled beer can on the floor underneath the driver's seat. The beer can contained Portillo's DNA. Hernandez testified the same men who had harassed him, about three or four in number, were the ones he observed beating and assaulting Lowe.

As we noted in our previous opinion in this case, the prosecution had two alternative theories of liability against appellant and Ulloa. The first was that they willfully participated as gang members in the confrontation with Hernandez and Frutos at the restaurant and the attack on Lowe which followed. Either they directly perpetrated the assault and attempted murder, or they directly aided and abetted it. Alternatively, the prosecution posited Portillo and Ulloa were guilty of attempted murder based on it being a natural and probable consequence of their group fight with Lowe. (*People v. Portillo*, *supra*, G043918.) The jury found both defendants guilty of attempted murder. Portillo was sentenced to a total of 33 years in state prison.

On January 5, 2022, he filed a petition to vacate and for resentencing under then-section 1170.95. The prosecution conceded Portillo had made the requisite prima facie showing of eligibility for relief, and so the trial court set an order to show cause hearing for May 20, 2022. After hearing argument and taking briefing, the court issued a minute order denying the petition: "After considering the facts in the trial transcript and the argument by counsel, the Court concludes beyond a reasonable doubt the defendant harbored express malice while aiding and abetting the attempted killing of the victim, Joshua Lowe."

4

On appeal, Portillo contends there was insufficient evidence to prove beyond a reasonable doubt that he was guilty of aiding and abetting attempted murder. He also argues the trial court considered inadmissible testimony from the prosecution's gang expert which was given at trial prior to certain updates to the gang statute. Before we get to these questions, we must first address his first argument: our standard of review.

## I. Standard of Review for Section 1172.6 Petitions

Citing *People v. Vivar* (2021) 11 Cal.5th 510 (*Vivar*), Portillo argues we should apply our independent judgment to the trial court's section 1172.6 ruling, rather than the substantial evidence standard which has been adopted by the majority of the courts who have considered the issue thus far. (See *People v. Sifuentes* (2022) 83 Cal.App.5th 217, 232; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 590-591; *People v. Oliver* (2023) 90 Cal.App.5th 466, 479 (*Oliver*); *People v. Njoku* (2023) 95 Cal.App.5th 27, 41 (*Njoku*).) Like the appellants in these cases, Portillo urges the adoption of a less deferential standard "because the trial court's inquiry was limited to a 'cold record'" consisting solely of documentary evidence with no live testimony. (See *Njoku, supra*, 95 Cal.App.5th at p. 41.)

In *Vivar*, the California Supreme Court held that an independent review standard applies to rulings on a motion to withdraw a plea due to adverse immigration consequences under section 1473.7. (*Vivar, supra,* 11 Cal.5th at pp. 524-525.) "A successful section 1473.7 motion requires a showing, by a preponderance of the evidence, of a *prejudicial* error that affected the defendant's ability to meaningfully understand the actual or potential immigration consequences of a plea." (*Id.* at p. 517.) "In choosing independent review in this context, the Supreme Court reasoned that analogous prejudice determinations in ineffective assistance of counsel claims were reviewed independently as predominantly legal questions; that the interests at stake

5

supported independent review where the determination was likely to be made from a cold record; and that prior appellate decisions had reviewed such prejudice determinations independently, but the Legislature, aware of this standard, did not alter it when amending the statute. (*Vivar, supra,* 11 Cal.5th] at pp. 524–527.) The Supreme Court went on to emphasize that its holding was 'a product of multiple factors with special relevance' in that context ([*Vivar, supra,* 11 Cal.5th] at p. 527) and reaffirmed the 'familiar postulate' that '"an appellate court should defer to the factual determinations made by the trial court,"' regardless of '"whether the trial court's ruling[s are based] on oral testimony or declarations"' ([*Vivar, supra,* 11 Cal.5th] at p. 528, fn. 7)." (*Oliver*, *supra*, 90 Cal.App.5th at pp. 479-480.)

We do not find *Vivar*'s reasoning salient here, and we join the other courts who have chosen a substantial evidence standard for reviewing section 1172.6 petitions. Unlike a section 1473.7 prejudice determination, the trial court's inquiry during the second stage of a section 1172.6 petition is predominantly factual in nature. Indeed, the trial court sits as an "independent factfinder" in the proceeding. (See *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

Perhaps more importantly, the *Vivar* court's concerns about a cold record do not ring true in this case. The *Vivar* court lamented that "[y]ears later, the judge adjudicating the resulting motion may never have participated in any of the underlying proceedings and must rely entirely on a cold record." (*Vivar, supra,* 11 Cal.5th at pp. 526-527.) We have no such worries in this case. The judge hearing the section 1172.6 petition was the same judge who sat through Portillo's 11-day trial. As such, the judge in this case had the opportunity to observe the demeanor and testimony of witnesses. This cold record here was warmer than most, and more like a recollection refresher for this experienced judge. We will not stray from the substantial evidence standard of review.

**II.        Substantial Evidence Supports Aiding and Abetting Liability**

The trial court was presented with no evidence indicating that Portillo himself stabbed Lowe. The prosecution all but acknowledged this. Thus, Portillo's fate rested on whether his participation in the assault was enough for him to be held liable for attempted murder.

The crime of attempted murder requires a specific intent to kill. (*See People v. Guerra* (1985) 40 Cal.3d 377, 386.) In order for Portillo to have been liable as an aider and abettor of attempted murder, he must have shared the specific intent of those who actually stabbed Lowe. Intent is shared "when [the defendant] knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (See *People v. Beeman* (1984) 35 Cal.3d 547, 560.)

The trial court here started with the premise that Portillo was present at the scene of the assault on Lowe and could see that members of the group had knives: "What I hear in this case is a violent group assault involving knives and the defendant. It's unreasonable to conclude that the defendant did not know that the others were stabbing the victim."

We must stop there and examine whether there was substantial evidence for the trial court's premise. There is. Ysidro Hernandez identified Portillo as one of the men who was acting aggressively toward him in front of Los Patios restaurant. And Hernandez also confirmed that the same men who accosted him were the ones he saw running down the street towards 7-Eleven and assaulting Lowe.[2] These two pieces of

---

[2] For this reason, we reject Portillo's contention that there was any reasonable inference he could have been driving the white Honda rather than participating in the assault on Lowe. If the same group of men walked from Los Patios to the 7-Eleven, and Portillo was among them, he could not have been driving the car. Our conclusion is further bolstered by the fact that Hernandez observed only three doors of the white Honda open when it pulled up to Los Patios. The driver's side door did not open. Portillo could not have gotten into the driver's seat of the car if someone was already sitting there. Indeed, the presence of Portillo's DNA on the beer can under the driver's seat is a good indication that he was in the back seat directly behind the driver.

evidence firmly establish two facts. First, Portillo was part of a group of men who accosted Hernandez at Los Patios and then proceeded to the 7-Eleven where they assaulted Lowe. Second, around the time of the crime, Portillo's demeanor towards others was aggressive and belligerent.

There was no evidence to indicate Portillo removed himself from the assault at the 7-Eleven. Rather, Hernandez said all four men he had encountered earlier were fighting with Lowe. Lowe, for his part, testified that all seven of the men who were fighting him were taking and landing blows. The only logical conclusion from this evidence is Portillo was engaged in the fight and saw what was occurring in real time.

Having arrived at the reasonable conclusion that Portillo was present and aware that stabbing was going on, the trial court then asked the following question: ". . . [U]nder those circumstances, is the only reasonable interpretation that the defendant harbored the intent to kill as opposed to is this a reasonable interpretation? This is what I want you to inform the Court. Is there also a reasonable interpretation that it was not intent to kill but rather to inflict serious GBI?"[3]

The evidence would lead us to answer that question in the negative. As the prosecutor said in response, Lowe's injuries were mostly in his chest area. The trauma surgeon who treated Lowe after the stabbing testified that Lowe suffered a partially collapsed lung. It is not reasonable to think someone could participate in an assault in which multiple assailants were stabbing the victim in the chest – in the vicinity of vital organs – and not have anything other than an intent to kill the victim.

Portillo's main criticism of the People's case is that he believes there was insufficient evidence of his actual role in the incident. We agree the evidence never crystallizes his specific conduct with respect to the assault on Lowe. But it does crystallize his presence at the scene, and his actions as part of the group of four around

---

[3] We presume the trial court was referring to "great bodily injury" pursuant to section 245, subdivision (a)(4).

the time it occurred.  The men who approached Lowe were making hand gestures and asking him where he was from, just as they had done to Hernandez.  They then jumped Lowe.  Given the lack of any evidence that any of the assailants abstained from the fight, Portillo – identified by Hernandez as part of the group – could only have been doing one of three things: restraining Lowe, landing punches or kicks (or attempting to land them), or stabbing him (or trying to stab him).  Portillo would concede specific intent is implicit in the third.  But the specific intent to assist the actual stabbers is also implicit in the other two possible actions.  By restraining the victim, the assailant intends to make it impossible for him to fight off the other attackers or escape.  By kicking and punching, the assailant intends to not only hurt the victim, but also compromise his strength so as to make him an easier target for the knife.  Any of these actions are sufficient to establish aiding and abetting liability for attempted murder.  As such, it was not necessary for the prosecution to prove Portillo's actual role.

**III.        Admissibility of Gang Testimony**

Finally, Portillo argues the trial court may have improperly relied on the testimony of the prosecution's gang expert at trial, Detective Patrick Rich, even though the testimony pre-dated the passage of Assembly Bill 333 which changed some aspects of section 186.22, the gang enhancement statute.  The record suggests otherwise.  At the evidentiary hearing, the trial court said as follows: "The inference that needs to be drawn in this case for the People to make your burden is a reasonable inference that the defendant harbored the intent to kill.  If there are two – if there's another reasonable inference – I'm sure you have heard it a lot – all ties go to the defense.  Keeping that in mind, from your summary here, which the Court appreciates, you did put significance to the testimony of the gang expert.  The gang expert, as I reviewed it, did tell the jury – and he was qualified to do that – about gang culture in general.  He told the jury about what a hit-up is.  I don't recall, nor do I think it would have been proper for Detective Rich, who was eminently qualified, to tell the jury – and by this process tell me – that the defendant

9

harbored the intent to kill.  I know that's clear."  From this statement, it is evident that the trial court was *not* going to rely on Detective Rich's testimony regarding gang culture in determining the central issue: whether Portillo had a specific intent to kill.

In any event, there was sufficient evidence separate and apart from Detective Rich's testimony to conclude the attack was, if not gang motivated, at least a group assault.  Hernandez, Frutos, and Lowe all heard and saw the men who approached them showing hand gestures and shouting things like "San Juan" and "Varrio Viejo." The men asked both Hernandez and Lowe where they were from and responded angrily when answered.  The evidence regarding gang culture was not crucial to understand that there was a group dynamic to this crime.

## DISPOSITION

The order of the trial court denying appellant's section 1172.6 petition is affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


SANCHEZ, J.