Filed 2/19/25  P. v. Craig CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G062413 |
| v. | (Super. Ct. No. FWV036874) |
| KENT CRAIG, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of San Bernardino County, Michael R. Libutti, Judge. Affirmed.

Ronda G. Norris, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, James M. Toohey and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

Kent Craig appeals the trial court's denial of his petition for resentencing under Penal Code section 1172.6.[1] Craig contends there was insufficient evidence to support the court's determination that he remains liable for murder under two still-valid theories—direct aider and abettor and felony murder. We conclude that substantial evidence supports the court's findings and affirm the postjudgment order.

## FACTS

### I.

### THE INFORMATION

An information charged Craig with first degree murder (§ 187, subd. (a); count 1) and conspiracy to commit assault by means of force likely to produce great bodily injury (§§ 182, subd. (a)(1), 245, subd. (a)(1); count 2), along with a gun enhancement (§ 12022, subd. (a)(1)). He plead not guilty and proceeded to jury trial in 2008.

### II.

### TRIAL TESTIMONY[2]

Craig and Cesar Guzman were close friends since childhood. As adults, they played basketball, played music, and smoked crack cocaine together every weekend. Craig became friends with the neighbors in his apartment complex, including the victim, Corle. Craig and Corle hung out

---

[1] All undesignated statutory references are to the Penal Code. Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6. (Stats. 2022, ch. 58, § 10.) For purposes of clarity, we refer to the statute as section 1172.6 throughout the opinion.

[2] This court took judicial notice of the appellate record in *People v. Craig,* case No. G041699. The facts are derived from the jury trial transcript.

nearly every night. Craig introduced Corle to Guzman a few months before the murder. They all frequently hung out, listening to music and doing drugs together. Guzman introduced his friend, Michael Jackson, to the hangouts.

Corle's relationships with Guzman and Craig soon soured. Guzman built and sold Corle a computer for $400, allowing him to pay him back in $100 monthly installments. Corle refused to pay the final $100 payment because he claimed there was a problem with the computer. Guzman was angry and cursed Corle out. Separately, Craig was furious that Corle would not return a set of speakers Craig lent him. A month before the murder, Craig called the police department to file a report about the dispute with Corle over the borrowed speakers.

About two weeks before the murder, Craig called the police again about his escalating dispute with Corle. An investigating officer went to the apartment complex. The officer testified that Craig was upset about the speakers and about Corle bumping into him in the parking lot. When speaking with the officer, Craig was using profanity, gritting his teeth, and waving his arms about. Craig told the officer, "'I don't want that mother fucker even talking to me,'" and that if he did, Craig would kick his ass. The officer felt Craig appeared "overly angry over the nature of the dispute."

Craig also spoke to one of his neighbors about the parking lot incident. Craig said he was glad the police were there because he was going to kill Corle. Craig told his neighbor it was not about the speakers or the money anymore; it was the principle. Craig told another neighbor that he was not going to stand for that, that he did not play games, and that he "'might as well kill [Corle].'" Craig's anger and comments prompted a neighbor to warn Corle to start locking his front door.

A few days before the murder, Craig, Guzman, and Jackson were playing music, drinking, and doing drugs together. Jackson grew irritated with Guzman and Craig's 45-minute conversation about a dispute. He recalled the dispute was about "[s]omething like speakers and computers and money owed." Craig and Guzman "were talking about hurting somebody or getting back at somebody or doing some bodily harm, and making somebody pay." The conversation was ruining Jackson's high, so he intervened, saying, "I'll take him out. I'll do it myself. . . . Just let it go." Craig replied with something like, "'No. . . . Glad you got my back, but if somebody's going to do something to me, I'll take care of it myself.'" Jackson's impression of Guzman and Craig's conversation was that they were going to kill the person. A couple days later Guzman called Jackson and told him, "'It's been dealt with. The boy's no longer with us. He's no longer in the land of the living.'" Guzman said he had nothing to do with it, and he was afraid.

Guzman testified that on the day of the murder, Craig called him several times, asking him to bring someone over to beat up Corle because Craig wanted his "fucking ass kicked." Guzman called up his and Craig's drug dealer, a gang member who goes by the moniker Hard Time. Hard Time agreed to beat up Corle for $50. Guzman relayed Hard Time's price to Craig, who agreed to pay it. Guzman drove to Hard Time's house nearby and picked him up. Hard Time asked Guzman if he would need a gun, and Guzman told him there was no need for a gun because they were not going to kill Corle.

Guzman drove Hard Time to Craig and Corle's apartment complex, and Craig was waiting in the parking lot. Guzman stayed in the car, while Hard Time approached Craig. Hard Time and Craig spoke for about 30 seconds, and Guzman saw Craig hand Hard Time something. Guzman testified that he assumed it was the $50, and it could not have been a gun.

4

Hard Time and Craig walked down a walkway in the complex, out of Guzman's line of sight. Guzman remained parked in the car.

After a few minutes, Guzman heard three to five gunshots. Guzman saw Craig running from the staircase area, simultaneously when the shots were fired. Craig had his hand over his mouth with "a surprise[d] look." About two minutes later, Guzman heard another round of gunshots. A few minutes after that, Guzman saw Hard Time walking toward him, carrying Corle's computer "as if nothing happened."

Guzman drove Hard Time home. On the drive, Hard Time was playing with the gun and told Guzman that Craig owes him more money because "this is murder." After dropping him off, Guzman had his car wiped down and destroyed the computer.

Craig called the police and reported hearing gunshots in the area, but responding officers were unable to locate the source of the gunshots. Guzman and Craig spoke on the phone. There was a lot of silence on the call, but they both expressed their surprise that Hard Time killed Corle. Neighbors discovered Corle's body early the next morning.

Over the following week, Hard Time asked Guzman for more money. Guzman relayed the message to Craig, who replied, "'I'm not paying that mother fucker another mother fuckin' penny.'" In later police interviews, Craig admitted that he paid Guzman $500 to give to Hard Time but denied being involved with the murder. He told police that Guzman and Hard Time were behind the murder because Guzman wanted his computer back.

Over the following months, Craig and Guzman grew nervous because the police were investigating them for Corle's murder. Guzman eventually admitted his involvement to the police and began working with them to incriminate Craig by recording their phone calls and wearing a wire.

Guzman never caught Craig's incriminating statements on a recording, but Guzman testified that Craig told him (unrecorded), "'I hated that [W]hite boy. I wish I could dig him up and kill him again.'"

III.

JURY INSTRUCTIONS AND JUDGMENT

The trial court instructed the jury on three theories of liability for first degree murder: (1) aiding and abetting an assault resulting in murder, which was the natural and probable consequence of the assault; (2) unlawfully killing a human being during the commission or attempted commission of burglary with the intent to steal or rob, or robbery (felony murder); and (3) killing that is the natural and probable consequence of the pursuit of a conspiracy to commit robbery or burglary with intent to steal or rob.

The jury convicted Craig on both counts and found the enhancement allegation true. The court sentenced Craig to 25 years to life in prison, plus a one-year determinative sentence for the vicarious gun use enhancement. We affirmed the judgment on appeal. (*People v. Craig* (Feb. 18, 2010, G041699) [nonpub. opn.].)

IV.

RESENTENCING PETITION

In 2019, Craig filed a resentencing petition under section 1172.6. The trial court denied the petition at the prima facie stage. On appeal, we reversed the order and remanded the case to the trial court to issue an order to show cause and hold an evidentiary hearing. (*People v. Craig* (Aug.15, 2022, G059438) [nonpub. opn.].)

The trial court held an evidentiary hearing pursuant to section 1172.6, subdivision (d). The parties submitted on the 2008 jury trial

6

transcripts. The court again denied Craig's petition for resentencing, finding that the evidence proved Craig's guilt for murder beyond a reasonable doubt under a direct aider and abettor theory and under the amended felony murder statute. Craig timely appealed the court's denial order, contending there was insufficient evidence for the court's guilty determination.

DISCUSSION

I.

STANDARD OF REVIEW

At an evidentiary hearing for a section 1172.6 petition, the trial court "acts as an independent fact finder" (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951) and determines whether the prosecution proved the defendant's guilt beyond a reasonable doubt under current law (§ 1172.6, subd. (d)(3)).

On appeal, we review the trial court's determination for substantial evidence. (*People v. Vargas, supra*, 84 Cal.App.5th at p. 951.) Substantial evidence is ""'evidence that is reasonable, credible, and of solid value'"" (*ibid.*), whether "contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt" (*People v. Clements* (2022) 75 Cal.App.5th 276, 298). Under this standard, ""'we review the entire record in the light most favorable to the judgment.'"" (*Vargas*, at p. 951.) And we presume the existence of every fact that the court, as the factfinder, could reasonably deduce from the evidence in support of the court's order. (*People v. Thomas* (2023) 14 Cal.5th 327, 377.) A reviewing court's opinion that the facts may also reasonably support a conclusion contrary to the trial court's does not necessarily warrant reversal. (*Id.* at pp. 377–378.) The reviewing court does not reweigh or reevaluate witness credibility. (*Id.* at p. 378.)

7

II.

SECTION 1172.6

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (SB 1437) amended sections 188 and 189, effectively narrowing felony murder and eliminating the natural and probable consequences as an aider and abettor to murder theory. (Stats. 2018, ch. 1015, §§ 1, subd. (f), 2–3.) It also created a post-conviction mechanism for qualifying defendants to seek resentencing in the trial court. (*Id.*, § 4; § 1172.6.)

Before SB 1437, "a defendant who aided and abetted an intended assault could be liable for murder, if the murder was the natural and probable consequence of the intended assault. [Citation.]" (*People v. Curiel* (2023) 15 Cal.5th 433, 449.) SB 1437 amended "the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

The Legislature stated that, except for the amended felony murder rule, "[a] person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).) It amended the statute governing "malice" by adding: "[I]n order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).) This "eliminate[d] liability for murder as an aider and abettor under the natural and probable consequences doctrine. [Citation.]" (*People v. Curiel, supra*, 15 Cal.5th at p.

8

449.) Liability for direct aiding and abetting a murder, however, remained intact. (*Id*. at p. 462.)

## III.

### DIRECT AIDER AND ABETTOR ANALYSIS

A person who aids and abets the commission of a crime is culpable as a principal in that crime. (§ 31.) A defendant is liable for murder perpetrated by another if he aided, promoted, encouraged, or instigated (*People v. Beeman* (1984) 35 Cal.3d 547, 561) "'the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission. [Citation.] . . . An aider and abettor who knowingly and intentionally assists [another] to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder.' [Citation.]" (*In re Lopez* (2023 14 Cal.5th 562, 579). The prosecution must prove the accomplice had "'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' [Citation]." (*People v. Gentile* (2020) 10 Cal.5th 830, 843.)

The trial court found that Craig directly aided and abetted the murder because he felt disrespected, angry, obsessed, and "hellbent" on "tak[ing Corle] out." The court concluded that Craig put the plan in motion, through Guzman, to elicit a hardened gang member to murder Corle. As for his intent to kill, the court found the witnesses' testimony about Craig's incriminating statements credible and persuasive.

Craig argues that it was Guzman who chose and hired Hard Time, that there was no evidence Craig handed Hard Time a gun in the 30-second meeting before the murder, and that the statements Craig made

9

before and after were out of anger and did not reflect reality. Craig contends the evidence showed he intended for Corle to get beaten up, not murdered.

We conclude there is substantial evidence supporting the trial court's determination that Craig is guilty of murder under a direct aider and abettor theory.

It is undisputed that Hard Time perpetrated the murder. Craig's act of initiating the attack by hiring Hard Time through Guzman, is evidence that he instigated the murder. Craig's payment of $500 to Hard Time is evidence confirming that he aided or promoted the murder. This evidence is sufficient to establish that Craig "aid[ed], promote[d], encourage[d], or instigate[d]" the murder. (*People v. Beeman*, *supra*, 35 Cal.3d at p. 561.) The crux of the inquiry is whether the evidence establishes Craig's intent to kill.

Craig's words speak for themselves. He demonstrated his intent to kill through his repeated incriminating and violent statements before and after the murder. Craig told one of his neighbors two weeks before the murder that he was going to kill Corle. He told another neighbor he was not going to stand for that, and he "'might as well kill [Corle].'" Just a few days before the murder, he spoke with Guzman in front of Jackson for 45 minutes about making somebody pay. He then told Jackson, "'I'll take care of it myself,'" which Jackson believed meant Craig would kill the person himself. And shortly after the murder Craig told Guzman, "'I hated that [W]hite boy. I wish I could dig him up and kill him again.'"

Although the evidence showed that Craig asked Guzman to bring someone to *beat* Corle up, there is sufficient evidence to support the trial court's determination that Craig harbored the intent to kill all along. We must not reverse the court's order solely because the evidence could support a contrary finding. Our role is to adopt the court's witness credibility

10

determinations, view the record in the light most favorable to the judgment, and consider whether reasonable, credible, and solid evidence supports the court's ultimate determination. We find it does.

Because we found the evidence supports the trial court's determination under the direct aider and abettor theory, we end our inquiry without considering the same under the revised felony murder doctrine.

IV.

DISPOSITION

The postjudgment order is affirmed.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


GOETHALS, J.

11