Filed 7/7/25  P. v. Broadway CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H051144 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 187487) |
| v. | |
| JAMES LEO BROADWAY, | |
| Defendant and Appellant. | |

In 1996, a jury found defendant James Leo Broadway guilty of attempted premeditated murder (Pen. Code,[1] §§, 187, 189, 664) and two counts of assault with a firearm (§ 245, subd. (a)(2)).  The jury further found true three attendant gang enhancement allegations (§ 186.22, subd. (b)(1)) but not true allegations that Broadway carried a firearm during the offenses (§ 12021.5).  For the attempted premeditated murder offense, the trial court sentenced Broadway to life in prison with the possibility of parole plus two years for the gang enhancement.

In 1999, on direct appeal, a different panel of this court (hereafter, the *Williams* court) struck the two-year gang enhancement attendant to the

---

[1] All further unspecified statutory references are to the Penal Code.

attempted murder count but otherwise affirmed the judgment. (See *People v. Williams, et al.* (May 12, 1999, H016423) [nonpub. opn.] (*Williams*).[2]) In rejecting a claim of insufficient evidence as to the attempted murder and assault with a firearm counts, the *Williams* court concluded there was sufficient evidence to support the convictions on an aiding and abetting theory of liability. (*Williams*, *supra*, H016423.)

In 2022, Broadway petitioned the trial court to vacate his attempted murder conviction and be resentenced under section 1170.95 (now section 1172.6). The trial court denied Broadway's petition at the prima facie stage, finding that his jury was not instructed on the natural and probable consequences doctrine and, thus, Broadway could not have been and was not convicted of attempted murder under that doctrine as required by section 1172.6.

In this appeal, Broadway makes several arguments challenging the trial court's denial of his petition, including that persons who could have been convicted of attempted murder under any imputed malice theory (not only the natural and probable consequences doctrine) are eligible for relief under section 1172.6.

For the reasons explained below, we affirm the trial court's order denying Broadway's petition.

---

[2] The direct appeal involved Broadway and his codefendant Elias Williams. We previously granted the Attorney General's request for judicial notice of the records in *Williams*, *supra*, H016423.

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Trial Proceedings*

### 1. Charges

In July 1996, the Santa Clara County District Attorney filed a second amended information (information) charging Broadway, Williams, and two other codefendants (Cory Demond Holmes and Terence Demond Tyson) with crimes related to a shooting that occurred on or about January 27, 1996.

Count 1 alleged that Broadway and his codefendants unlawfully and with malice aforethought attempted to kill Andre S.[3] (§§ 187, 189, 664.) Count 1 also alleged that Broadway and his codefendants willfully, deliberately, and with premeditation attempted to murder Andre S. (§§ 187, 189, 664.) Counts 2 and 3 respectively alleged that Broadway and his codefendants assaulted Fred G. and Tiagmal B. with a handgun. (§ 245, subd. (a)(2).) Count 4 alleged that Williams (alone) permitted another person to discharge a handgun from his vehicle. (§ 12034, subd. (b).)

The information additionally alleged, as to counts 1 through 3, that Broadway and his codefendants committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and while carrying a firearm in a vehicle (firearm carrying allegation) (§ 12021.5).

Regarding Williams, the information further alleged: as to counts 1 through 3, that Williams personally used a handgun (personal use allegation) (§§ 12022.5, subd. (a)(l), 1203.06); as to count 1, that Williams intentionally inflicted great bodily injury (GBI allegation) (§§ 12022.7, subd. (a)(l), 1203.06); and as to count 4, that Williams committed the offense for the

---

[3] We refer to all victims by first name and last initial to protect their privacy interests. (Cal. Rules of Court, rule 8.90(b)(4).)

benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and while carrying a firearm in a vehicle (§ 12021.5).

Broadway and his codefendants were tried together by jury in June–July 1996.

### 2. Trial Evidence

A description of the evidence presented at the joint trial of Broadway and his codefendants trial appears in the *Williams* opinion. (*Williams*, *supra*, H016423.) In the instant appellate briefing, both parties quote, in full, the facts section of the *Williams* opinion. Under these circumstances, we incorporate into this opinion the *Williams* court's description of the trial evidence. (*Ibid*.)

In brief, the trial evidence showed that the victims and defendants associated with rival street gangs. At some point prior to the instant shooting, victim Andre S. and codefendant Williams had been involved in a fight. Immediately preceding the shooting, victim Tiagmal B. and Broadway had a verbal confrontation in a high school parking lot. Codefendant Holmes opened the trunk of Williams's car and started " 'digging for something' " inside it. Broadway drove himself and his codefendants away from the parking lot. Williams took over driving his car. As the three victims walked along a sidewalk, the car drove past them. Someone in the car fired two shots at the victims from the driver's side window, hitting Andre S. in the leg. Later, Broadway told the police that Holmes had gone to the trunk to get Broadway's .25 caliber handgun. The police found a .38 caliber shell casing at the scene of the shooting and another .38 caliber shell casing on the floorboard inside Williams's car. (See *Williams*, *supra*, H016423.)

4

### 3. Instructions and Closing Arguments

Regarding count 1, the trial court instructed the jurors that the prosecution had to prove "[a] direct but ineffectual act was done by one person towards killing another human being" and that "[t]he person committing such act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being." (CALJIC No. 8.66.) The court continued, "acts of a person who intends to kill another person will constitute an attempt where those acts clearly indicate a certain, unambiguous intent to kill." (*Ibid*.) The court similarly instructed that "acts of a person who intends to commit a crime will constitute an attempt where those acts clearly indicate a certain, unambiguous intent to commit that specific crime." (CALJIC No. 6.00.)

The trial court explained that " '[m]alice' as it relates to attempted murder must be express. Malice is express when there is manifested an intention unlawfully to kill a human being" (capitalization & brackets omitted). (CALJIC No. 8.11.) Additionally, the court instructed: "In the crime of attempted murder . . . there must exist a union or joint union operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists the crime or allegation to which it relates is not committed. [¶] The crime of attempted murder requires the specific intent to kill a human being with express malice aforethought" (boldface & capitalization omitted). (CALJIC No. 3.31.)

Regarding whether the attempted murder was willful, deliberate, and premeditated, the trial court instructed the jurors that the prosecution had to prove "the attempt to commit murder was preceded and accompanied by a clear, deliberate intent to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection

5

and not under a sudden heat of passion or other condition precluding the idea of deliberation." (CALJIC No. 8.67.) The court added: "To constitute willful, deliberate, and premeditated attempt to commit murder, the would-be slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decides to kill and makes a direct but ineffectual act to kill another human being."[4] (CALJIC No. 8.67.)

Regarding liability for aiding and abetting, the trial court instructed the jurors with CALJIC No. 3.00 as follows: "The persons concerned in the commission or attempted commission of a crime who are regarded by law as principals in the crime thus committed or attempted and equally guilty thereof include: [¶] 1. Those who directly and actively commit or attempt to commit the act constituting the crime, or [¶] 2. Those who aid and abet the commission or attempted commission, of the crime" (brackets omitted).

The trial court further instructed on aiding and abetting with CALJIC No. 3.01 as follows: "A person aids and abets the commission or attempted commission of a crime when he or she, [¶] (1) with knowledge of the unlawful purpose of the perpetrator and [¶] (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, by act or advice, aids, promotes, encourages or instigates the commission of the crime. [¶] A person who aids and abets the commission or attempted commission of a crime need not be personally present at the scene of the crime. [¶] A person who is not present aids and abets a crime by advising and encouraging its commission with the intent or purpose of committing,

---

[4] As to count 1, the trial court additionally instructed the jurors on the lesser included offense of attempted voluntary manslaughter based upon sudden quarrel/heat of passion, as well as some lesser related offenses, including assault with a firearm.

6

encouraging or facilitating the commission of the crime.  [¶]  Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.  [¶]  Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting" (boldface & brackets omitted).

Additionally, the trial court instructed the jurors that they "must decide separately whether each of the defendants is guilty or not guilty." (CALJIC No. 17.00.)

The trial court rejected the prosecutor's request that it instruct the jurors on aiding and abetting liability under the natural and probable consequences doctrine (see CALJIC No. 3.02).  The court said it had "problems with" the natural and probable consequences doctrine "in an express intent murder case."  The court explained:  "[I]f the only thing that the people [on trial] thought was going to be done, other than the shooter, was a brandishing or a shooting from a car, . . . and no one -- didn't share [*sic*] in the express intent to kill, you don't get a murder, attempted murder conviction under the allegations in this case."

In closing argument, the prosecutor maintained that Williams fired the shots as he drove his car past the victims.  In the same vein, the prosecutor described Broadway (as well as codefendants Holmes and Tyson) as "an aider and abettor" of the attempted murder and assaults.

Broadway's defense counsel argued, inter alia, that the evidence failed to prove Broadway harbored the requisite mental states for attempted premeditated murder:  "As it relates to Mr. Broadway, there is no evidence whatsoever of malice aforethought, a manifestation of an intent to kill somebody.  [¶]  As to all of the people that are on trial in this case, there is no evidence of any willful, deliberate and premeditation.  No evidence of any

7

thought process with a view toward accomplishing a homicide or murder." Counsel further argued: "[W]e just don't have a common thread as it relates to Mr. Broadway. No willfulness, no premeditation, no deliberation. Nothing of any kind that would establish an intent to injure, murder, hurt, anyone out there in that parking lot that night." Counsel concluded his argument by stating: "As it relates to Mr. Broadway, there is one alternative to you all in this case. And that's to find him not guilty on all counts, based on the evidence in this case."

Holmes's defense counsel and Tyson's defense counsel similarly argued that the prosecution had to prove the defendant's liability individually under the aiding and abetting instructions.

4. <u>Verdicts and Sentence</u>

On July 15, 1996, the jury convicted Broadway of an attempted murder committed willfully, deliberately, and with premeditation (count 1) and two assaults with a firearm (counts 2 & 3). The jury's verdict on count 1 specifically stated that the attempted murder "was committed by James Leo Broadway, who did unlawfully and with malice aforethought attempt to kill" Andre S. and that "James Leo Broadway, did willfully, deliberately and with premeditation attempt to murder Andre S." In addition, for Broadway, the jury found true the gang enhancement allegations attached to counts 1 through 3 but not true the attached firearm carrying allegations.

Regarding Broadway's codefendants, the jury convicted Williams on all counts (counts 1–4, including premeditation and deliberation for the attempted murder) and found true the gang enhancement allegation attached to each count but found not true the personal use allegations, the firearm carrying allegations, and the GBI allegation attached to count 1.

8

The jury convicted Tyson on all counts (counts 1–3, including premeditation and deliberation for the attempted murder) and found true the gang enhancement allegation attached to each count but found not true the firearm carrying allegations.

The jury acquitted Holmes of all charges and lesser offenses except for a lesser related misdemeanor for carrying a firearm on count 1. The jury further found true the firearm carrying allegation attached to count 1 and not true the gang enhancement allegation.

On January 9, 1997, the trial court sentenced Broadway on count 1 to life in prison with the possibility of parole and a consecutive two-year gang enhancement, concurrent to an aggregate determinate term of five years for counts 2 and 3.

B. *Direct Appeal*

Broadway raised several claims on direct appeal, including a claim (raised jointly with codefendant Williams) that "the evidence showed their presence at the crime scene but did not establish that they aided and abetted the shooter with knowledge of his unlawful purpose and with the intent that a crime be committed." (*Williams*, *supra*, H016423.)

In May 1999, the *Williams* court rejected Broadway's claim of insufficient evidence, concluding "the events leading up to, and the circumstances surrounding, the shooting amply support a jury determination that [Broadway and Williams] encouraged or facilitated the drive-by shooting with knowledge of their fellow gang member's intent to do that shooting."[5] (*Williams*, *supra*, H016423.)

---

[5] When discussing relevant legal principles, the *Williams* court said the following: "To be liable as an aider and abettor, the defendant 'must "act with knowledge of the criminal purpose of the perpetrator and with an intent

The *Williams* court explained its assessment of the evidence: "Defendant Broadway's conviction can be upheld on an aider and abettor theory without relying solely on his gang membership to establish intentional aiding. While it is significant that [Tiagmal] B[.] and [Andre] S[.] were associated with one gang, whereas Williams and Broadway were members of a rival gang, there is ample additional evidence of Broadway's direct[] participation in the preparation for, and the flight after, the drive-by shooting which supports his three convictions. The inference of intent finds support in Broadway's acts prior to the shooting, namely that (1) Broadway had placed his loaded .25 caliber gun in the trunk of his cousin Williams's car; (2) Broadway, Holmes, Tyson, and Williams were together, near Williams's car when Broadway used a derogatory epithet toward [Tiagmal B.], who was part of a group including [Andre S.]; (3) Broadway participated in his group's mad-dogging staredown of [Andre S.]'s group; and (4) after the mad-dogging began and Holmes had taken Broadway's gun out of the trunk and into the passenger compartment, Broadway got behind the wheel and drove off, but the car made a U-turn and immediately returned with someone firing two shots out of the driver's side of the car directly at the victims." (*Williams, supra*, H016423.)

The *Williams* court rejected Broadway's other claims of error and affirmed the judgment with a modification striking the two-year gang

---

or purpose either of committing, or encouraging or facilitating commission of: the offense." [Citation.] The jury must find "the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense." ' " (*Williams, supra*, H016423, citing *People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 [quoting *People v. Croy* (1985) 41 Cal.3d 1, 12, fn. 5 (*Croy*)].) The *Williams* court also cited *People v. Beeman* (1984) 35 Cal.3d 547, 561 (*Beeman*). (*Williams, supra*, H016423.)

10

enhancement (§ 186.22, subd. (b)(l)) attached to count 1. (*Williams*, *supra*, H016423, citing *People v. Ortiz* (1997) 57 Cal.App.4th 480, 485–486.)

C. *Petition for Resentencing*

In January 2022, Broadway, on his own behalf, filed a two-page form petition for resentencing under section 1170.95 (now section 1172.6) (petition). The trial court appointed counsel, and the district attorney filed a response to the petition.

In August 2022, Broadway, through counsel, filed a brief in support of his petition, asserting multiple arguments for an order to show cause under section 1172.6, subdivision (c). Broadway contended, inter alia, that the jury "instructions allowed the jury to impute malice based on his participation in a lesser offense, as is underscored by the Court of Appeal opinion affirming his conviction which was based on the same principles that allowed the jury to impute malice (prior to a 2001 Supreme Court opinion that changed the governing legal authority)"—namely, *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*).[6]

---

[6] In *McCoy*, our Supreme Court explained that "outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator. . . . 'When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]' [Citation.] What this means here, when the charged offense and the intended offense—murder or attempted murder—are the same, i.e., when guilt does not depend on the natural and probable consequences doctrine, is that the aider and abettor must know and share the murderous intent of the actual perpetrator." (*McCoy*, *supra*, 25 Cal.4th at p. 1118, citing *Beeman*, *supra*, 35 Cal.3d at p. 560 & *People v. Prettyman* (1996) 14 Cal.4th 248, 259, fn. omitted.) In addition, the *McCoy* court acknowledged prior confusion regarding the difference between direct aider

In the brief supporting his petition, Broadway argued that the jury instructions allowed the jury to find him "guilty of premeditated attempted murder if the shooter premeditated and deliberated killing Andre [S.] by shooting toward him as well as [Tiagmal B.] and [Fred G.], and Mr. Broadway encouraged the shooter to shoot toward the three. That combination would make Mr. Broadway 'equally guilty' with the shooter, and thus, would make Mr. Broadway guilty of premeditated attempted murder of [Andre S.] – without the jury having to find Mr. Broadway intended to kill – based on the jury finding only aiding and abetting an assault with a firearm."

Additionally, Broadway asserted that although his conviction "was based on a theory of imputed malice that wasn't the 'natural and probable consequences doctrine' *per se*" (acknowledging the lack of instruction with CALJIC No. 3.02), he nonetheless is eligible for relief under section 1172.6. He further contended "there is no evidence that [he] intended for Andre [S.] to be killed, as would be required for aiding and abetting attempted murder based on a theory other than imputed malice." Broadway further contended that issue preclusion is inapplicable to this case for various reasons.

---

and abettor liability and aider and abettor liability based on the natural and probable consequences doctrine. The *McCoy* court clarified the situation, stating: "Our discussion in *People v. Croy, supra,* 41 Cal.3d at page 12, footnote 5, contained language that has caused some confusion: 'It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which *Beeman* holds must be found by the jury.' This statement [in *Croy*] was part of a discussion of liability for an *unintended* crime under the natural and probable consequences doctrine. Our reference to the 'target offense' should more accurately have been to the charged crime. When the charged crime and the intended crime are the same, i.e., when guilt is *not* predicated on the natural and probable consequences doctrine, the aider and abettor must, indeed, share the actual perpetrator's intent." (*McCoy*, at p. 1118, fn. 1.)

The district attorney filed a brief opposing Broadway's petition. The district attorney contended, inter alia, that Broadway is ineligible for relief because his jury was not instructed on the natural and probable consequences doctrine and, thus, he "was not convicted of attempted murder under the natural and probable consequences doctrine." The district attorney further asserted that Broadway's argument for relief amounted to one that his jury was improperly instructed on intent to kill—a claim he failed to raise on direct appeal. The district attorney additionally contended there is no ambiguity in the jury instructions provided at Broadway's trial and *People v. Langi* (2022) 73 Cal.App.5th 972 is inapposite.

Broadway filed a rejoinder brief. He reiterated that "as in *Langi*, an aider and abettor in [the instant] case could have been convicted of aiding and abetting the perpetrator's crime with only a mental state of intent to aid and abet a felony assault." Broadway asserted, "When there was an instructional pathway for the jury to have convicted the petitioner of murder or attempted murder under a theory not recognized by current law, the jury's verdict does not defeat a prima facie case." He further asserted, "If the jury's instructions were such that the jury might rationally have based its verdicts on something less than intent to kill, the elements of issue preclusion are not met."

The trial court held a hearing on Broadway's petition. On June 6, 2023, the trial court filed a written order denying the petition.

The trial court concluded that Broadway failed to make a prima facie showing of entitlement to relief. The court explained that "[b]y its plain language," section 1172.6 "twice provides that a person convicted of attempted murder may be eligible for relief only where he could have been or was convicted 'under the natural and probable consequences doctrine.'

13

Broadway was convicted by a jury and his jury was not instructed on the natural and probable consequences doctrine. He thus was not and could not have been convicted of attempted murder under that theory. Therefore, he is ineligible for relief under section 1172.6. (*People v. Coley* (2022) 77 Cal.App.5th 539, 548.)"

The trial court further found Broadway's reliance on *Langi* to be "misplaced," because that case "did not address attempted murder and . . . attempted murder convictions after trial are eligible for relief only when a jury is instructed on the natural and probable consequences doctrine."

The trial court acknowledged Broadway's contention that irrespective of the natural and probable consequences doctrine, "the jury could have found him guilty of attempted murder without finding that he personally harbored malice aforethought." The court rejected that contention, explaining: "[U]nder section 1172.6, what Broadway calls 'an instructional pathway' to attempted murder 'by imputing malice' does not entitle him to relief unless that pathway was the natural and probable consequences doctrine. Moreover, to the extent the jury, or the Court of Appeal, could have misinterpreted the law of accomplice liability for attempted murder, this is not a circumstance that would absolve Broadway of attempted murder liability 'because of changes to [s]ection 188 or 189 made effective January 1, 2019.' (§ 1172.6, subd. (a)(3).)"

## II. DISCUSSION

A. *The Parties' Contentions*

Broadway raises several arguments challenging the trial court's denial of his petition. He contends: (1) a person who could have been convicted of attempted murder under any imputed malice theory (not only the natural and probable consequences doctrine) is eligible for relief under section 1172.6;

14

(2) issue preclusion does not apply in this case because of a material change in law effected by *McCoy* after his judgment became final; (3) he is eligible for section 1172.6 relief because his jury had "an instructional pathway" allowing it to find him guilty of attempted murder by imputing malice based on his participation in a lesser crime and without having to find that he personally acted with malice; (4) the jury's attempted murder verdict is not preclusive on the issue of intent to kill because it was tainted by hearsay evidence that is inadmissible under more recent precedent, namely *People v. Sanchez* (2016) 63 Cal.4th 665 and *People v. Valencia* (2021) 11 Cal.5th 818; (5) other changes in law render inadmissible significant gang expert evidence presented at his trial and defeat issue preclusion; and (6) "[i]t is certain that jurors must have used some theory of imputed malice, because there was no evidence that Mr. Broadway harbored actual malice – i.e., intent to kill – that would support an attempted murder conviction under current law" (underscoring omitted).

The Attorney General responds: (1) Broadway is ineligible for relief under the plain terms of section 1172.6 because he was not convicted of attempted murder under the natural and probable consequences doctrine; (2) there was no material change in attempted murder law after Broadway's conviction and, regardless, Broadway's jury was instructed correctly that it had to find an intent to kill to convict Broadway either as an actual perpetrator or as a direct aider and abettor; (3) the record conclusively proves Broadway was not convicted under a theory of imputed malice; (4) changes to law regarding the admissibility of gang expert testimony and hearsay do not defeat issue preclusion; and (5) a challenge to the sufficiency of the evidence for a conviction cannot establish a prima facie case for relief when the jury was correctly instructed on applicable law.

15

B. *Legal Principles*

    1. <u>Section 1172.6</u>

Senate Bill No. 1437 (Senate Bill 1437) took effect on January 1, 2019. (See Stats. 2018, ch. 1015, § 4.) "With the goal of 'more equitably sentenc[ing] offenders in accordance with their involvement in homicides' [citation], Senate Bill 1437 significantly changed the scope of murder liability for defendants who did not actually kill or intend to kill anyone, including those prosecuted on a felony-murder theory." (*People v. Wilson* (2023) 14 Cal.5th 839, 868 (*Wilson*).) "The bill also altered murder liability under the natural and probable consequences doctrine." (*Wilson*, at p. 868, fn. 8; see § 188.[7])

"The Legislature, to provide relief to those with existing murder convictions dependent on theories of the crime it had rejected, devised a path to resentencing. [Citations.] It has since expanded this path to allow relief for those with 'attempted murder' convictions based on 'the natural and probable consequences doctrine.' (§ 1172.6, subd. (a); Stats. 2021, ch. 551, § 2 (Sen. Bill No. 775).[8]) The current resentencing statute, now codified in

---

[7] Section 188 (as amended by Senate Bill 1437) provides in relevant part: "(a) For purposes of [s]ection 187, malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart. [¶] (3) Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime."

[8] When the Legislature enacted Senate Bill No. 775, it explained that the bill "[c]larifies that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and]

16

section 1172.6 . . ., provides that 'a person convicted of . . . attempted murder under the natural and probable consequences doctrine . . . may file a petition with the court that sentenced the petitioner to have the petitioner's . . . conviction vacated and to be resentenced on any remaining counts when' three conditions apply.  (§ 1172.6, subd. (a).)"[9]  (*People v. Patton* (2025) 17 Cal.5th 549, 558 (*Patton*).)

As relevant here, the three conditions in section 1172.6(a) are:  (1) the information allowed the prosecution to "to proceed under a theory of . . . *attempted murder under the natural and probable consequences doctrine*" (*id.*, subd. (a)(1), italics added); (2) petitioner was convicted of attempted murder following a trial (*id.*, subd. (a)(2)); and (3) "petitioner could not presently be convicted of . . . attempted murder because of changes to [s]ection 188 or 189 made effective January 1, 2019."  (*Id.*, subd. (a)(3).)

"A petition's facial validity, entitling petitioner to counsel, is readily established by recitation of section 1172.6's requirements.  (§ 1172.6, subd. (b)(3).)  . . .  At this initial stage, 'substantive merit' is not the question." (*Patton*, *supra*, 17 Cal.5th at p. 562.)  " '[T]he prima facie inquiry under subdivision (c)'—the relevant inquiry here—is, also, 'limited.'  [Citation.]  It is

probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories."  (Stats. 2021, ch. 551, § 1, subd. (a).)

[9] Section 1172.6, subdivision (a) (hereafter section 1172.6(a)) provides in full:  "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, *attempted murder under the natural and probable consequences doctrine*, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply."  (Italics added.)

not, however, simply duplicative of the facial inquiry. [Citation.] For instance, [our Supreme Court] explained in [*People v. Lewis* (2021) 11 Cal.5th 952] that after the appointment of counsel, a court looks beyond the face of the petition. [Our high court] stated: 'The record of conviction will necessarily inform the trial court's prima facie inquiry . . . , allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*Id.* at pp. 562–563, fn. omitted.)

During the prima facie stage of review, the trial court " ' "takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved." ' " (*People v. Lewis*, *supra*, 11 Cal.5th 952, 971 (*Lewis*).) Although the court may rely on the record of conviction in determining whether defendant has made a prima facie showing, the court "should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id.* at p. 972; see also *Patton*, *supra*, 17 Cal.5th at pp. 565–566 ["Where facts from the record of conviction are undisputed, accepting them over contrary legal allegations that are merely conclusory is not 'factfinding involving the weighing of evidence or the exercise of discretion.' "].)

Jury instructions and verdict forms are part of the record of conviction and may be relied on to make the prima facie determination. (See *People v. Antonelli* (2025) 17 Cal.5th 719, 731 (*Antonelli*) ["In assessing section 1172.6 petitions from individuals convicted following jury trials, the jury instructions will be critical."]; *People v. Bodely* (2023) 95 Cal.App.5th 1193, 1200 (*Bodely*); *People v. Nguyen* (2024) 103 Cal.App.5th 668, 677.) "[A] relevant jury finding is generally preclusive in section 1172.6 proceedings, i.e., it 'ordinarily establish[es] a defendant's ineligibility for resentencing

18

under Senate Bill 1437 and thus preclude[s] the defendant from making a prima facie case for relief.' " (*People v. Curiel* (2023) 15 Cal.5th 433, 453–454.)

## 2. Attempted Murder Law

" 'Specific intent to kill is a necessary element of attempted murder. It must be proved, and it cannot be inferred merely from the commission of another dangerous crime.' " (*People v. Collie* (1981) 30 Cal.3d 43, 62; see also *People v. Lee* (2003) 31 Cal.4th 613, 623 (*Lee*) ["Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."]; *People v. Rodriguez* (2024) 103 Cal.App.5th 451, 456 (*Rodriguez*) ["Implied malice cannot support a conviction of attempted murder."]; *People v. Mumin* (2023) 15 Cal.5th 176, 190 [same].) An intent to kill is shown if the assailant either desires the death of the victim or knows to a substantial certainty that death will occur as the result of the assailant's action. (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

"Prior to the enactment of Senate Bills Nos. 1437 [citations] and 775 [citations], the natural and probable consequences doctrine provided an avenue for finding an aider and abettor acted with malice. [Citation.] Under this doctrine, an aider and abettor who lacked a specific intent to kill could be found guilty of attempted murder solely due to their participation in a different target crime, if attempted murder was the natural and probable consequence of the target crime." (*Rodriguez, supra*, 103 Cal.App.5th at p. 456.) When a defendant was "found guilty of attempted murder under a natural and probable consequences theory of liability, the 'intent to kill' was imputed onto [the defendant] from the actual killer or perpetrator." (*People v. Montes* (2021) 71 Cal.App.5th 1001, 1007.) "Because section 188,

19

subdivision (a)(3), prohibits imputing malice based solely on participation in a crime, the natural and probable consequences doctrine cannot prove an accomplice committed attempted murder.  Accordingly, the natural and probable consequences doctrine theory . . . is now invalid." (*People v. Sanchez* (2022) 75 Cal.App.5th 191, 196.)  Section 1172.6 thus "permits a defendant convicted of attempted murder under the natural and probable consequences doctrine to petition for resentencing." (*Rodriguez, supra*, 103 Cal.App.5th at p. 457.)

Although a defendant can no longer be held liable for attempted murder based on the natural and probable consequences doctrine, under current law, "[d]irect aiding and abetting remains a valid theory of attempted murder after the enactment of Senate Bill No. 775." (*People v. Coley, supra*, 77 Cal.App.5th 539, 548 (*Coley*); see also *People v. Ervin* (2021) 72 Cal.App.5th 90, 101 ["Liability for intentional, target offenses is known as 'direct' aider and abettor liability; liability for unintentional, nontarget offenses is known as the ' " 'natural and probable consequences' doctrine." ' "].)

For the purposes of direct aider and abettor liability, "[w]hen the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.]  Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means

20

that the person guilty of attempted murder as an aider and abettor must intend to kill." (*Lee, supra*, 31 Cal.4th at p. 624; see also *Beeman, supra*, 35 Cal.3d at p. 560; *People v. Acero* (1984) 161 Cal.App.3d 217, 224 ["a jury must find the aider and abettor shared the perpetrator's specific intent to kill"]; *People v. Chiu* (2014) 59 Cal.4th 155, 166–167, superseded by statute as stated in *Lewis, supra*, 11 Cal.5th at p. 959, fn. 3 [discussing direct aiding and abetting principles]; *Chiu*, at pp. 171–172 (conc. & dis. opn. of Kennard, J.); *People v. Gentile* (2020) 10 Cal.5th 830, 843, superseded by statute on another ground as stated in *Wilson, supra*, 14 Cal.5th at p. 869 [explaining direct aiding and abetting principles]; *People v. Powell* (2021) 63 Cal.App.5th 689, 712–713 ["As the court in *McCoy* made clear, direct aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea."].)

### 3. Standard of Review

"We independently review the denial of a resentencing petition at the prima facie stage, whether the denial is based on the issue preclusion doctrine [citation], the law of the case doctrine [citation], or, more generally, failure by the petitioner to make a prima facie showing under section 1172.6." (*People v. Beaudreaux* (2024) 100 Cal.App.5th 1227, 1238–1239; accord, *Bodely, supra*, 95 Cal.App.5th at p. 1200 [applying de novo review].) If the denial of the resentencing petition was legally correct, we affirm that denial regardless of the trial court's reasoning. (*People v. Camacho* (2022) 14 Cal.5th 77, 123.)

" 'The interpretation of a statute and the determination of its constitutionality are questions of law. In such cases, appellate courts apply a de novo standard of review.' " (*People v. Alexander* (2023) 91 Cal.App.5th 469, 474.)

21

" 'In construing a statute, our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute. [Citation.] We begin with the language of the statute, giving the words their usual and ordinary meaning. [Citation.] The language must be construed "in the context of the statute as a whole and the overall statutory scheme, and we give 'significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " [Citation.] In other words, " 'we do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." [Citation.]' " [Citation.] If the statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences.' " (*People v. Killian* (2024) 100 Cal.App.5th 191, 205.)

C. *Analysis*

By its plain and unambiguous terms, section 1172.6(a) allows only individuals "convicted of . . . *attempted murder under the natural and probable consequences doctrine*" (italics added) to seek relief under the statute's resentencing procedures. The further phrase in section 1172.6(a) permitting relief to a person convicted "under the natural and probable consequences doctrine or *other theory under which malice is imputed* to a person based solely on that person's participation in a crime" (italics added) applies only to a "*person convicted of felony murder or murder*." (Italics added.) "If the plain language of the statute is clear and unambiguous, our

22

inquiry ends, and we need not embark on judicial construction." (*People v. Johnson* (2002) 28 Cal.4th 240, 244.)

As Broadway acknowledges, and as noted *ante* (see pt. I.A.3.), the trial court did not instruct Broadway's jury on the natural and probable consequences doctrine of aider and abettor liability. Thus, the jury could not have convicted Broadway of attempted murder under that doctrine. (See *People v. Soto* (2020) 51 Cal.App.5th 1043, 1055 [defendant "was not and could not have been convicted of second degree murder under the natural and probable consequences doctrine" because "the jurors were not provided any instruction on which they could have found [him] guilty of murder under that doctrine"].) Instead, the trial court instructed the jurors on direct aiding and abetting principles with CALJIC Nos. 3.00 and 3.01.

Because the jury instructions did not permit the jury to convict Broadway based on the now-invalid theory of "attempted murder under the natural and probable consequences doctrine" (§ 1172.6(a)), under the plain language of section 1172.6(a), Broadway is ineligible for relief as a matter of law. (See *Coley, supra*, 77 Cal.App.5th at p. 548; *People v. Lovejoy* (2024) 101 Cal.App.5th 860, 865; see also *Patton, supra*, 17 Cal.5th at p. 605 [describing the determination under § 1172.6(a) as "whether a petitioner was convicted under a now-invalid theory"].[10])

---

[10] After the completion of briefing in this case, the Fourth District Court of Appeal, Division Three decided *People v. Luu* (2025) 110 Cal.App.5th 1051 (*Luu*). Broadway filed a letter informing this court of that new authority (Cal. Rules of Court, rule 8.254) and has requested permission to file supplemental briefing on *Luu*. We deny that request.

*Luu* concerns the denial of a section 1172.6 petition filed by a defendant who was found not guilty of attempted murder but guilty of attempted voluntary manslaughter (as a lesser included offense) based on instructions that included the natural and probable consequences doctrine. (*Luu, supra*,

Broadway contends that interpreting section 1172.6 as we have (to exclude a person like him whose jury did not receive instruction on the natural and probable consequences doctrine for attempted murder) violates federal and state principles of equal protection. He asserts that excluding attempted murder convictions which were based on forms of imputed malice other than natural and probable consequences doctrine (including forms that were not recognized under law because they were based on legal error) and applying the phrase " 'or other theory under which malice is imputed to a

---

110 Cal.App.5th at pp. 1057–1058.) The trial court denied defendant's petition at the prima facie stage. On appeal, the defendant argued that "the Legislature intended that defendants convicted of attempted manslaughter under the natural and probable consequences doctrine are eligible for relief under section 1172.6, and a contrary interpretation has led to an unjust and absurd result." (*Id.* at p. 1059.) The *Luu* court agreed, concluding the defendant "is eligible for relief under section 1172.6 because he was convicted of attempted manslaughter under the now invalid natural and probable consequences doctrine. Our holding is consistent with the Legislature's intent, and a contrary interpretation has led to an unintended, unjust, and manifestly absurd result." (*Id.* at p. 1067.)

The *Luu* court's holding is inapposite to the present case because in *Luu*, the defendant's conviction on the lesser included offense of attempted manslaughter rested on the application of the natural and probable consequences doctrine, which the Legislature has expressly identified as an invalid theory of liability for the greater offense of attempted murder. Further, while it might be unjust and absurd to find a defendant ineligible for relief under section 1172.6 in the context of a lesser conviction that is based on the natural and probable consequence doctrine, we are not convinced the same conclusion applies to an attempted murder conviction that is independent of the natural and probable consequences doctrine. As discussed *ante* (addressing Broadway's equal protection claim), the Legislature could have rationally decided to afford relief to those convicted of attempted murder (and attempted voluntary manslaughter) based on the natural and probable consequences doctrine, while at the same time precluding relief for an attempted murder conviction based on some "other theory under which malice is imputed" (§ 1172.6(a)).

person based solely on that person's participation in a crime' " in section 1172.6, subdivision (a) only to those convicted of murder "would be arbitrary and irrational as well as contrary to the actual legislative intent."

The federal and California Constitutions guarantee individuals the equal protection of the laws. (*People v. Hardin* (2024) 15 Cal.5th 834, 847 & fn. 2 (*Hardin*).) " '[T]he requirement of equal protection ensures that the government does not treat a group of people unequally without some justification.' [Citation.] 'Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.' " (*People v. Williams* (2024) 17 Cal.5th 99, 122.)

"In resolving an equal protection challenge, we apply different levels of scrutiny depending on the type of classification involved. [Citation.] ' "At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose." ' [Citation.] If the unequal treatment involves a suspect class or fundamental right, then we apply strict scrutiny and ' " 'the state bears the burden of establishing not only that it has a compelling interest which justifies the law but that the distinctions drawn by the law are necessary to further its purpose.' [Citation.]" ' [Citation.] 'The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.' "[11] (*People v. Williams, supra,* 17 Cal.5th at p. 122, italics omitted.)

---

[11] Broadway makes no argument that the alleged unequal treatment in this case involves a suspect class or fundamental right. We thus review his equal protection claim under the rational basis standard. (See *People v. Sanchez* (2020) 48 Cal.App.5th 914, 921 [applying rational basis review to a challenge to section 1170.95]; see also *People v. Williams, supra,* 17 Cal.5th at pp. 123–124 [applying rational basis review to a challenge to section 3051's

"Rational basis review 'sets a high bar' for litigants challenging legislative enactments." (*Hardin, supra,* 15 Cal.5th at p. 852.) "Under this deferential standard, we presume that a given statutory classification is valid 'until the challenger shows that no rational basis for the unequal treatment is reasonably conceivable.' " (*Ibid.*)

As alluded to *ante* (see pt. II.B.1.–2.), when the Legislature enacted Senate Bill 1437 and Senate Bill No. 775, the natural and probable consequences doctrine was the only valid theory of imputed malice applicable to attempted murder. Thus, the Legislature could have rationally decided that there was no need to attach the phrase "or other theory under which malice is imputed to a person based solely on that person's participation in a crime" (§ 1172.6(a), added by Sen. Bill No. 775 (Stats. 2021, ch. 551, § 2)) to attempted murder convictions.

Relatedly, given that the law has for decades required an intent to kill for a direct aider and abettor of attempted murder (see *Lee, supra,* 31 Cal.4th at pp. 623–624 [citing, inter alia, *Beeman* and *McCoy*]), the Legislature could have rationally decided that any alleged error implicating the imputation of malice in a case involving direct aider and abettor liability (but not involving the natural and probable consequences doctrine) could have been and should continue to be addressed through direct appeal or extant procedural mechanisms for collaterally attacking the conviction. (See § 1259 ["The appellate court may [] review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial

---

categorical exclusion of young adults convicted of sexual offenses and sentenced under the One Strike law]; *People v. Mitchell* (1994) 30 Cal.App.4th 783, 796 ["Determining gradations of culpability includes setting the dividing line between legal and illegal conduct. It does not implicate the strict scrutiny test for equal protection purposes."].)

rights of the defendant were affected thereby."]; *People v. Miller* (1992) 6 Cal.App.4th 873, 880 ["Instructional error which amounts to a deprivation of constitutional rights may be alleged in a petition for writ of habeas corpus."].) Before the Legislature enacted Senate Bill No. 775, one Court of Appeal had interpreted section 1170.95 as "not permit[ting] a petitioner to establish eligibility on the basis of alleged trial error." (*People v. DeHuff* (2021) 63 Cal.App.5th 428, 438.) "Generally, we presume that the Legislature is aware of appellate court decisions." (*City and County of San Francisco v. Strahlendorf* (1992) 7 Cal.App.4th 1911, 1915.)

For these reasons, we conclude there is a rational basis for section 1172.6's limitation on eligibility to persons "convicted of" "attempted murder under the natural and probable consequences doctrine" (§ 1172.6(a)). We thus reject Broadway's claim that finding him ineligible for relief under section 1172.6(a) violates his right to equal protection.

Because we have concluded Broadway is ineligible for relief as a matter of law under the plain terms of section 1172.6(a) and his equal protection rights have not been violated, we decline to reach Broadway's remaining, contingent contentions and express no opinion on them.

We, likewise, deny on relevance grounds Broadway's requests for judicial notice of briefing filed by the Attorney General and the State Public Defender (as amicus curiae) in *Antonelli*, as well as a portion of the oral argument in that matter. After Broadway filed his requests for judicial notice, the California Supreme Court issued its opinion in *Antonelli, supra*, 17 Cal.5th 719. There, our high court held that because a jury could have imputed malice to a nonprovocateur defendant in a provocative act murder prosecution before *People v. Concha* (2009) 47 Cal.4th 653, "the Court of Appeal was wrong to conclude that such a defendant would be categorically

27

ineligible for section 1172.6 relief." (*Antonelli*, at p. 731.)  The Supreme Court also stated that "the jury instructions tracked the governing law at the time of" (*id.* at p. 732) defendant Antonelli's trial, which " 'imposed culpability on all perpetrators of the underlying crime so long as the provocateur acted with malice, and did so in furtherance of the common criminal design,'  provided that the deceased was not the sole provocateur." (*Id.* at p. 730.)

Because *Antonelli* is inapposite to our conclusions that Broadway is ineligible for relief as a matter of law under the plain language of section 1172.6(a) regarding attempted murder and there is no equal protection violation, we deny Broadway's requests for judicial notice.  (See *Hughes Electronics Corp. v. Citibank Delaware* (2004) 120 Cal.App.4th 251, 266.)

### III.  DISPOSITION

The trial court's June 6, 2023 order is affirmed.

_____
Danner, Acting P. J.

WE CONCUR:




_____
Wilson, J.




_____
Bromberg, J.




**H051144**
***People v. Broadway***